Opinion by Judge O’SCANNLAIN; Concurrence by Judge KLEINFELD; Dissent by Judge BERZON.
OPINION
O’SCANNLAIN, Circuit Judge:
We must decide whether a faith-based humanitarian organization is exempt from Title VII’s prohibition against religious discrimination.
I
Silvia Spencer, Ted Youngberg, and Vicki Hulse were terminated by World Vision, Inc. (“World Vision”) on account of their religious beliefs. Religious discrimination is, of course, barred by Title VII of the Civil Rights Act. See 42 U.S.C. § 2000e-2(a). That bar, however, does not apply to “a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such [entity] of its activities.” Id. § 2000e-l(a). World Vision’s eligibility for this exemption is the issue presented in this appeal.
A
World Vision describes itself as “a Christian humanitarian organization dedicated to working with children, families and their communities worldwide to reach their full potential by tackling the causes of poverty and injustice.” What began in 1950, when Dr. Robert Pierce started sending a monthly donation to a child in China, has become World Vision International (“WVI”): a federation of eighteen independent and thirty-four semi-autonomous entities operating in countries around the world. World Vision — the party to this case — is the U.S. arm of WVI.
Spencer and Hulse had both worked for World Vision for approximately ten years prior to their dismissal. Spencer provided various services related to the upkeep and maintenance of the organization’s technology and facilities, and Hulse was responsi *1111 ble for miscellaneous office tasks, such as scheduling and telephone coverage. Youngberg worked for World Vision for almost two years; his duties included coordinating shipping and facilities needs as well as scheduling.
When they were hired, Spencer, Hulse, and Youngberg (collectively, the “Employees”) submitted required personal statements describing their “relationship with Jesus Christ.” See infra p. 1125. All acknowledged their “agreement and compliance” with World Vision’s Statement of Faith, Core Values, and Mission Statement. See infra pp. 1121,1125.
In 2006, World Vision discovered that the Employees denied the deity of Jesus Christ and disavowed the doctrine of the Trinity.[1] As this was incompatible with World Vision’s doctrinal beliefs — specifically, the belief that “there is one God, eternally existent in three persons: Father, Son, and the Holy Spirit” — the Employees were terminated. See infra p. 1121.
B
The Employees lodged their complaint in the U.S. District Court for the Western District of Washington, alleging discrimination in violation of Title VII of the Civil Rights Act. In response, World Vision filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and (b)(6). On the Employees’ motion, the district court converted World Vision’s request into a motion for summary judgement and allowed discovery to proceed.
Ultimately, the district court granted summary judgment to World Vision, con-eluding that it was a religious entity within the meaning of 42 U.S.C. § 2000e-l. Spencer v. World Vision, Inc., 570 F.Supp.2d 1279, 1280 (W.D.Wash.2008). In making this determination, the district court decided that the factors discussed in EEOC v. Kamehameha Schools/Bishop Estate, 990 F.2d 458 (9th Cir.1993), “d[id] not provide an accurate framework ... to determine whether a religious organization that is not an educational institution is entitled to Title VII exemption.” Id. at 1285. The court instead relied on the factors discussed in LeBoon v. Lancaster Jewish Community Center Ass’n, 503 F.3d 217 (3d Cir.2007). Id. at 1285-86. Consideration of those nine factors led the court to hold that World Vision’s “purpose and character are primarily religious,” and thus, the organization fell within the language of 42 U.S.C. § 2000e-l. Id. at 1289.
The Employees timely appealed.
II
There is no dispute that the Employees were fired for religious reasons. For purposes of this appeal,[2] such termination was permissible if — and only if— World Vision is a “religious corporation, association, ... or society” under 42 U.S.C. § 2000e-l(a). Our only inquiry, therefore, is a de novo review of the district court’s summary judgment that World Vision qualifies for the exemption. See Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir.2003) (“Viewing the evidence in the light most favorable to the plaintiffs, we must determine whether there are any genuine issues of material fact and whether the [district court] correctly applied the relevant substantive law.”).[3]
*1112 A
Typically, the question of whether an organization is religious for purposes of section 2000e-l warrants little analysis. In most cases, the organization seeking the exemption is “clearly” religious, and the result is straightforward. See EEOC v. Townley Eng’g & Mfg. Co., 859 F.2d 610, 618 (9th Cir.1988). No one would dispute, for example, that the. Church of Jesus Christ of Latter-Day Saints is a religious organization. See, e.g., Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987).
We have twice addressed this question where the result was less than obvious. In Townley, we decided that a for-profit manufacturer of mining equipment did not qualify for the exemption. 859 F.2d at 619. We characterized our inquiry as an effort “to determine whether the ‘general picture’ of [an] institution is primarily religious or secular.” Id. at 618 n. 14 (emphasis added). In making that determination, we emphasized that “each case must turn on its own facts. All significant religious and secular characteristics must be weighed to determine whether the corporation’s purpose and character are primarily religious. Only when that is the case will the corporation be able to avail itself of the exemption.” Id. at 618. We also analyzed the “far from comprehensive” legislative history of section 2000e-l, speculating that when it enacted the exemption, Congress “assumed that only those institutions with extremely close ties to organized religions would be covered. Churches, and entities similar to churches, were the paradigm.” Id. at 617-18 (“[T]he central function of section 702 has been to exempt churches, synagogues, and the like, and organizations closely affiliated with those entities.”). Institutions “merely ‘affiliated’ with a religious organization” would not qualify. Id. at 617.
In Kamehameha, we reaffirmed Town-ley while concluding that two private educational institutions did not qualify for the section 2000e-l exception. 990 F.2d at 460. We further explained that section 2000e~l would be construed “narrowly,” and the institution seeking the benefit of the statute would “bear the burden of proving [it is] exempt.” Id. Applying Townley’s “primarily religious” test, we weighed the secular and religious characteristics of the schools, specifically referencing their (1) ownership and affiliation, (2) purpose, (3) faculty, (4) student body, (5) student activities, and (6) curriculum. Id. at 461-63.
Ours has not been the only circuit to consider scope of the section 2000e~l exemption. In LeBoon, the Third Circuit concluded that a Jewish community center was a religious organization within the meaning of section 2000e-l. In doing so, it agreed with Towmley that the proper inquiry involved a weighing of “ ‘[a]ll significant religious and secular characteristics.’ ” LeBoon, 503 F.3d at 226 (alteration in original) (quoting Townley, 859 F.2d at 618). The court then considered nine factors other “courts have looked at” in determining whether an entity qualified for section 2000e-l:
(1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity’s articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the en *1113 tity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.
Id. (citing Kamehameha, 990 F.2d 458 and Townley, 859 F.2d at 618-19). The Third Circuit added the caveat that “not all factors will be relevant in all cases, and the weight given each factor may vary from case to case.” Id. at 227. The court also noted that the section 2000e-l exemption should not be denied to institutions because they, inter alia, engage in some secular activities, do not adhere to the strictest tenets of their faith, or do not hire only coreligionists. Id. at 229-30.
1
The Employees’ first contend that by applying the nine factors set forth in Le-Boon, rather than the six factors laid out in Kamehameha, the district court violated Ninth Circuit precedent. The Employees argue that LeBoon “explicitly rejected the Ninth Circuit’s narrow interpretation of § 2000e-l” — a narrow interpretation the Employees assert limits the exemption to “churches, synagogues, and the like” or “[cjhurches, and entities similar to churches.” Townley, 859 F.2d at 618 & n. 14
Despite the Employees’ protestations to the contrary, our interpretation of section 2000e-l is not as “narrow” as they would have it. First, in Townley, we did not confine our inquiry to considering whether the manufacturing firm at issue was essentially a church. Rather, we weighed all relevant religious and secular characteristics to determine whether the company at issue was “primarily religious or secular” in nature. See id. at 618-19. Moreover, Townley’s allegedly limiting language— “[cjhurches, and entities similar to churches” — appears in its discussion of section 2000e-l’s legislative history, a discussion on which our holding did not depend. See id.; see also Kamehameha, 990 F.2d at 460 n. 5 (“In any event, the test the court adopted in Townley does not depend on an analysis of the legislative history.”).[4] At the least, the comment seems more appropriately characterized as a “suggestion” rather than a strict rule. LeBoon, 503 F.3d at 230.
 Second, the reading of section 2000e-l propounded by the Employees is belied by the text of the statute. Congress extended the exemption to any “religious corporation, association, ... or society.” 42 U.S.C. § 2000e-l(a). If Congress had intended to restrict the exemption to “[cjhurches, and entities similar to churches” it could have said so. Because Congress did not, some religious corporations, associations, and societies that are not churches must fall within the exemption.[5]
*1114 Third, the canon of constitutional avoidance counsels against the Employees’ stringent interpretation of section 2000e-l. See NLRB v. Catholic Bishop, 440 U.S. 490, 500, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (“[A]n Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available.”). In Toumley itself, we noted that the Free Exercise Clause “clearly” protects “organizations less pervasively religious than churches.” 859 F.2d at 620 n. 15; see also id. at 618 n. 13 (explaining that even absent the exemption for religious organizations, “the First Amendment would limit Title VII’s ability to regulate the employment relationships within churches and similar organizations”). Moreover, the Employees’ reading also potentially runs afoul of the Establishment Clause’s core command of neutrality among religious groups. See, e.g., Larson v. Valente, 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (“[The] clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.”). As the United States argues as amicus, interpreting the statute such that it requires an organization to be a “church” to qualify for the exemption would discriminate against religious institutions which “are organized for a religious purpose and have sincerely held religious tenets, but are not houses of worship.” See Thomas M. Messner, Can Parachurch Organizations Hire and Fire on the Basis of Religion Without Violating Title VII?, 17 U. Fla. J.L. & Pub. Pol’y 63, 69-71 (2006) (listing numerous such “para-church” organizations); see also Colo. Christian Univ. v. Weaver, 534 F.3d 1245, 1259 (10th Cir.2008). It would also raise the specter of constitutionally impermissible discrimination between institutions on the basis of the “pervasiveness or intensity” of their religious beliefs. Colo. Christian, 534 F.3d at 1259; see also Univ. of Great Falls v. NLRB, 278 F.3d 1335, 1342 (D.C.Cir.2002) (“[A]n exemption solely for ‘pervasively sectarian’ schools would itself raise First Amendment coneerns-discrimi-nating between kinds of religious schools.”). Thus, the cramped reading of the exemption put forth by the Employees raises serious questions under both the Free Exercise Clause and the Establishment Clause. As we must, we reject this constitutionally questionable interpretation.
That said, there is no denying that we have held that section 2000e-l should be construed “narrowly.” Kamehameha, 990 F.2d at 460. But the same panel which held that a narrow construction was necessary found nothing contradictory between such a reading and Toumley’s requirement of a case-by-case weighing of “ ‘[a]ll significant religious and secular characteristics ... to determine whether the corporation’s purpose and character are primarily religious.’ ” Id. (quoting Toumley, 859 F.2d at 618). Analysis of additional or alternative factors cannot contravene circuit precedent which explicitly mandates consideration of “ ‘[a]ll significant religious and secular characteristics.’ ” Id. (emphasis added).
In sum, when confronted with a section 2000e-l case, Toumley and Kamehameha require us to analyze, on a case-by-case basis, whether the “general picture” of an organization is “primarily religious,” taking into account “[a]ll significant religious and secular characteristics.”[6]
*1115 2
Though our precedent provides us with the fundamental question — whether the general picture of World Vision is primarily religious — we must assess the manner in which we are to answer that question in the case at hand. Again, we are told that we must evaluate “[a]ll significant religious and secular characteristics.” Townley, 859 F.2d at 618. The Employees insist that this means we should analogize and apply the Kamehameha factors. World Vision urges us to do the same with those considered in LeBoon.
a
Of course, our caselaw does not compel us to march down a checklist of considerations. Quite the contrary, we have never “attempt[ed] to outline [section 2000e-l’s] precise scope,” concluding instead that “each case must turn on its own facts.” Townley, 859 F.2d at 618. We would thus be remiss to hold that factors which are “significant” in one case must be similarly “significant” in all others. As the Third Circuit trenchantly observed, “not all factors will be relevant in all cases, and the weight given each factor may vary from case to case.” LeBoon, 503 F.3d at 227. Our past precedent tracks this methodology. We did not consider identical “factors” in Kamehameha and Townley. Compare Townley, 859 F.2d at 619, with Kam.ehameha, 990 F.2d at 461-63. This makes eminent sense. After all, Kamehameha involved an educational institution. Townley involved a for-profit manufacturing company. Thus, it should come as no surprise that dogmatic application of the factors set forth in Kamehameha— several of which were explicitly tailored to schools — is inapt when we consider the status of World Vision. As a non-profit humanitarian relief organization, World Vision is a different animal.
Rigid adherence to the LeBoon factors is also unwarranted, though for several additional reasons. As an initial matter, applying some of the factors set forth in that opinion to entities such as World Vision could create several oddities. To take just one example, LeBoon could be read to ask us to consider whether World Vision’s “members” — here, its employees — are coreligionists. See LeBoon, 503 F.3d at 226. But if World Vision does not qualify for the exemption, hiring employees on the basis of their religion would constitute a gross violation of Title VII. We will not encourage organizations to take actions that might otherwise be illegal in order to boost their chances to qualify for the exemption. See Killinger v. Samford Univ., 113 F.3d 196, 199-200 (11th Cir.1997) (“We are also aware of no requirement that a religious educational institution engage in a strict policy of religious discrimination— such as always preferring Baptists in employment decisions — to be entitled to the exemption.”).
b
Even more importantly, several of the LeBoon factors could be constitutionally troublesome if applied to this ease. For example, one of the factors asks us to take into account the “religious” or “secular” nature of a particular product or service. See LeBoon, 503 F.3d at 226. The Supreme Court, however, has repeatedly cautioned courts against venturing into this constitutional minefield.
In Amos, the Court found exactly this sort of inquiry problematic in the context of determining whether a particular employee’s duties were religious or secular. There, the lower court had held that a “building engineer” at a church gymnasium performed a secular activity. 483 U.S. at 332, 107 S.Ct. 2862. The Supreme Court reversed, explaining that to force an *1116 organization to “predict which of its activities a secular court will consider religious,” would impose a “significant burden” and “might affect the way an organization carried out what it understood to be its religious mission.” Id. at 336, 107 S.Ct. 2862. As Justice Brennan wrote in concurrence,
determining whether an activity is religious or secular requires a searching case-by-case analysis. This results in considerable ongoing government entanglement in religious affairs. Furthermore, this prospect of government intrusion raises concern that a religious organization may be chilled in its free exercise activity. While a church may regard the conduct of certain functions as integral to its mission, a court may disagree.
Id at 343-44, 107 S.Ct. 2862 (Brennan, J., concurring) (internal citation omitted). If we should not be in the business of determining whether a particular “activity” is religious or secular, our competence to make that determination with respect to a particular “product” or “service” is in serious doubt.
Similarly, in New York v. Cathedral Academy, 434 U.S. 125, 98 S.Ct. 340, 54 L.Ed.2d 346 (1977), the Court struck down a law which authorized reimbursement payments to nonpublic schools for certain “testing services required by state law.” Id. at 127, 98 S.Ct. 340. The Court held that the law created a Catch-22: it either impermissibly advanced religion by providing support for testing which furthered religion, or it resulted in excessive entanglement with religion as the government attempted to sort out religious and nonreligious activities. Id. at 132-33, 98 S.Ct. 340. As to the latter, the Court remarked that “[t]he prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment.”[7] Id. at 133, 98 S.Ct. 340.
In the case at hand, however, we have repeatedly been asked to engage in exactly this sort of inquiry into “what does or does not have religious meaning.” For example, World Vision contends that its humanitarian relief efforts have religious meaning; the Employees claim they do not. If we were to apply this prong of the LeBoon test to the case at hand, we would at least implicitly have to answer to that question. The very act of making that determination, however, runs counter to the “core of the constitutional guarantee against religious establishment.” Cathedral Acad., 434 U.S. at 133, 98 S.Ct. 340; see also Catholic Bishop, 440 U.S. at 502, 99 S.Ct. 1313 (noting that, when inquiring into whether a particular position was religious or secular, “[i]t is not only the conclusions that may be reached by the [government agency] which may impinge on rights guaranteed by the Religion Clauses, hut also the very process of inquiry leading to findings and conclusions ” (emphasis added)); cf. Mitchell v. Helms, 530 U.S. 793, 828, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurali *1117 ty opinion) (“[I]nquiry into ... religious views ... is not only unnecessary but also offensive. It is well established ... that courts should refrain from trolling though a person’s or institution’s religious beliefs.”).
Section 2000e-l’s statutory history suggests that we are not the only governmental entity to recognize the dangers of this particular inquiry. An earlier version of the statute extended the exemption merely to the “religious activities” of covered organizations. See Civil Rights Act of 1964, Pub.L. No. 88-352, § 702, 78 Stat. 241, 255 (stating that Title VII did not apply “to a religious corporation, association, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, or society of its religious activities ” (emphasis added)). Congress amended the statute, however, to remove the limiting reference to “religious activities.” See Equal Employment Opportunity Act of 1972, Pub.L. No. 92-261, § 3, 86 Stat. 103,104.
On a related note, LeBoon asks us to determine whether an organization’s founding purpose is religious or secular in nature. See LeBoon, 503 F.3d at 226. For all the reasons discussed above, where the nature of an organization’s purpose is disputed, this factor is a second invitation to wander into the constitutional briar patch of distinguishing between the sacred and the secular. If we are ill-equipped to determine whether an activity or service is religious or secular in nature, how are we to know which side of the line an entity’s “purpose” falls on? [8]
c
The factor which would have us ask whether an organization is affiliated with or supported by a “formally religious” entity is no less problematic. See LeBoon, 503 F.3d at 226; Kamehameha, 990 F.2d at 461. In the first place, this inquiry begs the question: it gives no means by which to determine whether the parent organization is religious. While that answer is obvious when dealing with, for example, a Catholic hospital, it would not be so straightforward when the parent entity is less obviously religious.
Moreover, this consideration contains the potential for discrimination amongst religious institutions. In short, a constrained reading of this factor favors institutions which claim a denominational affiliation over those who do not.[9] As the United States argues as amicus curiae, “[t]o deny World Vision the protection of section 2000e-l(a) also could raise serious constitutional questions by discriminating in favor of houses of worship and against independent, ‘parachurch’ groups like World Vision, which are organized for religious purposes and have religious tenets, but are not affiliated with any particular congregation or sect.” See also Larson, *1118 456 U.S. at 244, 102 S.Ct. 1673; Colo. Christian, 534 F.3d at 1259 (refusing to discriminate between “types” of religious institutions); Great Falls, 278 F.3d at 1346 (same).
d
The Supreme Court’s decision in Larson is instructive. In that case, the Court struck down “a Minnesota[] statute imposing certain registration and reporting requirements upon only those religious organizations that solicit more than fifty percent of their funds from nonmembers.” 456 U.S. at 230, 102 S.Ct. 1673. The Court observed that such law made “explicit and deliberate distinctions between different religious organizations.” Id. at 246 n. 23, 102 S.Ct. 1673. It
effectively distinguished] between well-established churches that have achieved strong but not total financial support from their members, on the one hand, and churches which are new and lacking in a constituency, or which, as a matter of policy, may favor public solicitation over general reliance on financial support from members, on the other hand.
Id. (internal quotation marks omitted). Such preferences were unconstitutional unless justified by compelling governmental interests. Id. at 246-47, 102 S.Ct. 1673.
Thus, weighing the religious or irreligious nature of funding sources could pose similarly troublesome difficulties involving “distinctions between different religious organizations.” As was the case in Larson, looking to whether an entity is “finan-daily supported” by a formally religious entity could effectively discriminate between “well-established” organizations, who have weaned themselves of revenue from their “mother” church, and those “which are new” and still dependent on their parent organization. In the same way, such inquiry could discriminate between organizations which “favor public solicitation over general reliance on financial support” from other religious institutions.[10]
In spite of these attendant constitutional concerns, both Tovmley and Kamehameha relied on characterizations of whether certain attributes of a organization were secular or religious in nature. See Kamehameha, 990 F.2d at 461-63; Tovmley, 859 F.2d at 619. Those characterizations, however, were not our own. In Tovmley, the secular nature of the company’s product was “admitted[ ].” 859 F.2d at 619. Likewise, Kamehameha contains no indication that the religious or secular nature of any particular activity or purpose was in dispute.[11] See 990 F.2d at 461-64. Obviously, if there is no controversy regarding a religious or secular classification, the constitutional concerns detailed above are not implicated. Thus, where there is no dispute that a particular activity or purpose is religious in nature, we may rely on the parties’ characterization. In a case such as this, where the matter is hotly contested, however, we should stay our hand and rely on considerations that do not require us to engage in constitutionally precarious inquires. See LeBoon, 503 *1119 F.3d at 230 (citing entanglement concerns as a reason for declining to decide whether an activity was religious or cultural).
e
As for the affiliation factor, to the extent we are required to consider it, we are disinclined to afford it much weight in light of potential it presents for discrimination amongst religious institutions.[12] The fact that prior organizations found eligible for section 2000e-l relief have generally been “wholly or partially owned by a church,” Kamehameha, 990 F.2d at 461 n. 7, does not mean that we should deny relief to equally religious organizations that are not similarly affiliated.
Ill
A
Although Judge Kleinfeld and I agree on the forgoing principles and on the result in this case, we disagree as to the proper test for distinguishing religious entities entitled to the section 2000e-l exemption from those entities not entitled to the exemption.
In my view, where the religious or nonreligious nature of a particular activity or purpose is in dispute, we should not rely exclusively on LeBoon’s hodgepodge of constitutionally questionable inquiries. Rather, I believe the better approach can be summarized as follows: a nonprofit entity [13] qualifies for the section 2000e-l exemption if it establishes that it 1) is organized for a self-identified religious purpose (as evidenced by Articles of Incorporation or similar foundational documents), 2) is engaged in activity consistent with, and in furtherance of, those religious purposes, and 3) holds itself out to the public as religious. See Great Falls, 278 F.3d at 1343; Universidad Cent. de Bayamon v. NLRB, 793 F.2d 383, 399-400, 403 (1st Cir.1985) (en banc) (Breyer, J.).
This analysis minimizes any untoward differentiation among religious organizations and any unseemly judicial inquiry into whether an activity is religious or secular in nature. First and foremost, it centers on neutral factors (i.e., whether an entity is a nonprofit and whether it holds itself out as religious). Rather than forcing courts to “troll[ ] through the beliefs of [an organization], making determinations about its religious mission,” Great Falls, 278 F.3d at 1342, it permits an institution to acknowledge its own religiosity. The furtherance prong likewise avoids any untoward judicial inquiry; all we must do is evaluate the purpose provided by the organization against the organization’s practice.
The initial consideration, whether the entity is a nonprofit, is especially significant. Because “persons having a personal and private interest in the activities of[a nonprofit] organization” may not receive any portion of its net earnings, 26 C.F.R. § 1.501(a) — 1(c); see id. § 1.501(e)(3)-1(c)(2), an organization’s status as a nonprofit bolsters a claim that its purpose is nonpecuniary. It is true that a “nonprofit” may make a “profit” — at least in the sense that it may have net earnings because its revenues exceed its costs. But, a nonprofit entity is distinguished from a for-profit entity by what it does with its net earnings. A nonprofit entity must spend any net earnings to advance its tax-exempt purpose, and may not distribute its net *1120 earnings to its principals as dividends, bonuses, or excessively high salaries. See 26 U.S.C. § 501(c)(3) (stating that an organization qualifies as a nonprofit if “no part of the net earnings of [the organization] inures to the benefit of any private shareholder or individual”); see also 26 C.F.R. § 1.501 (c)(3) — 1 (b)(4). This is not to say that a nonprofit organization may not compensate its employees at a market rate. See 26 C.F.R. § 1.501(c)(3)-l(f)(2)(ii) (stating that the IRS may revoke an organization’s nonprofit status for providing its employees disproportionate compensation for their services). Just as a nonprofit hospital may pay $5 million for a new MRI machine that costs $5 million, it may pay $400,000 a year to hire a radiologist when the going rate for a radiologist is $400,000 a year. See id.
Because a nonprofit may not distribute its net earnings to its organizers or employees, the fact that an entity is structured as a nonprofit provides strong evidence that its purpose is purely nonpecuniary. As Justice Brennan observed in his concurrence in Amos, “[t]he fact that an operation is not organized as a profit-making commercial enterprise makes colorable a claim that it is not purely secular in orientation.” Amos, 483 U.S. at 344, 107 S.Ct. 2862 (Brennan, J., concurring).[14] Indeed, “nonprofits historically have been organized specifically to provide certain community services, not simply to engage in commerce.” Id. “[Provision of such services [is often regarded] as a means of fulfilling religious duty and providing an example of the way of life a [religion] seeks to foster.” Id. These realities bolster a “contention that an entity is not operated simply in order to generate revenues ..., but that the activities themselves are infused with a religious purpose.” Id.
The test I propose also ensures that the section 2000e-l exemption will remain “narrowf].” Kamehameha, 990 F.2d at 460. Requiring that an organization hold itself out as religious “helps to ensure that only bona fide religious institutions are exempted.” Great Falls, 278 F.3d at 1344. “[S]ueh public representations serve as a market check. While public religious identification will no doubt attract some[people] to the institution, it will dissuade others. In other words, it comes at a cost. Such market responses will act as a check on institutions that falsely identify themselves as religious merely to obtain [the benefit of the section 2000e-l] exemption ....” Id.
B
Having set forth what I believe to be the appropriate test to determine whether an organization qualifies for the section 2000e-l exemption, I now apply it to the facts of this case.
1
I first note that World Vision operates as a nonprofit entity. See Townley, 859 F.2d at 619; see also LeBoon, 503 F.3d at 226; Killinger, 113 F.3d at 199. The Employees make much of the fact that World Vision is a “billion-dollar-per year” business whose leaders receive six-figure salaries. They highlight the contrast between the large, international humanitarian relief organization that is World Vision, and the local Jewish community center in LeBoon, which served only a “discrete religious community.”
In essence, the Employees ask this court to penalize World Vision for doing “too much” humanitarian work. They do not explain how the scope of World Vision’s *1121 operations changes the undisputed fact that World Vision is a nonprofit entity which the IRS has classified as a 501(c)(3) tax-exempt organization. Cf. Townley, 859 F.2d at 619 (noting that the company’s for-profit status weighed against section 2000e-l coverage). I am satisfied that World Vision’s nonprofit status “makes colorable [World Vision’s] claim that it is not purely secular in orientation.” Amos, 483 U.S. at 344, 107 S.Ct. 2862 (Brennan, J., concurring).
2
I next assess whether World Vision is organized for a self-identified religious purpose. See LeBoon, 503 F.3d at 226; Kamehameha, 990 F.2d at 462; Tovmley, 859 F.2d at 619; cf. LeBoon, 503 F.3d at 226-27 (“It is apparent from the start that the decision whether an organization is ‘religious’ for purposes of the exemption cannot be based on its conformity to some preconceived notion of what a religious organization should do, but must be measured with reference to the particular religion identified by the organization.”). Even a cursory review of World Vision’s Articles of Incorporation, bylaws, core values, and mission statement reveal explicit and overt references to a religious purpose.[15]
World Vision’s 1950 Articles of Incorporation, state that the “primary business” of the organization “is to conduct Christian religious missionary services, to assist in improving and ameliorating the moral and social conditions of humanity, [and] to provide services to God’s people which will enable them to accomplish more quickly and efficiently the Great Commission of advancing the Kingdom of God on earth.” As amended in 1980, the Articles read:
The primary exclusive and only purposes for which this corporation is organized are religious ones ... including ... to conduct Christian religious and missionary services, to disseminate, teach and preach the Gospel and teachings of Jesus Christ, to encourage and aid the growth, nurture and spread of the Christian religion and to render Christian service, both material and spiritual to the sick, the aged, the homeless and the needy. The recital of these purposes ... is intended to be exclusive of any and all other purposes, this corporation being formed for such religious purposes only.
Also included in the Articles is the commitment to “continually and steadfastly uphold and maintain the following statement of faith,” which begins:
(a) We believe the Bible to be the inspired, the only infallible, authoritative Word of God.
(b) We believe that there is one God, eternally existent in three persons: Father, Son, and the Holy Spirit.
(c) We believe in the deity of our Lord Jesus Christ, in His virgin birth, in His sinless life, in His miracles, in His vicarious and atoning death through His shed blood, in His bodily resurrection, in His ascension to the right hand of the Father, and in His personal return.
This Statement of Faith is echoed in the organization’s “Core Values,”[16] mission statement,[17] and “Core Characteristics.”[18]
*1122 In Kamehameha, the instrument that established the schools, a will, did not provide that the schools’ purpose was religious, only that “the teachers of said schools shall forever be persons of the Protestant religion.” 990 F.2d at 459. After considering the entire record, we concluded that “the general picture of the [sjchools reflects a primarily secular rather than a primarily religious orientation.” Id. at 461. We took note that the schools’ public statements and curriculum had once emphasized their Protestant roots, but that by the 1990s, the schools’ religious characteristics consisted of “minimal, largely comparative religious studies, scheduled prayers and services, quotation of Bible verses in a school publication, and the employment of nominally Protestant teachers for secular subjects.” Id. at 462-63. By contrast, World Vision’s organizing principles were religious, it has always presented itself as a religious institution, and it continues to do so. Thus, I have no trouble concluding that unlike the private schools in Kamehameha or the business in Townley, World Vision is organized for an avowedly religious purpose.
3
Having established that World Vision’s organizing principles are avowedly religious, I examine whether the organization is engaged in activity consistent with, and in furtherance of, those purposes. The Employees claim that, like the schools in Kamehameha, the World Vision’s activities are no longer in line with its stated purposes. See Kamehameha, 990 F.2d at 462. To that end, the Employees place emphasis on the fact that World Vision does not condition receipt of its services on religious belief.
In practical terms, World Vision’s profession that it is “dedicated to serving God by serving man” plays itself out through “six basic ministries”: “1) caring for children in need, 2) building self reliance among the needy, 3) emergency aid and relief, 4) evangelism, 5) strengthening Christian leadership and 6) educating Americans about the needs of the suffering around the world.” Among other things, World Vision provides disaster relief services, assists in combating the spread of HIV/AIDS, and runs programs which pair at-risk children and teens with mentors from their community. The organization also reaches out to American churches to raise awareness about humanitarian needs around the globe.
To the general public, World Vision is perhaps best known for its child sponsorship program. Donors are paired with particular children and their contributions provide access to clean water, food, health care, education, vocational training, and— for those children who are interested — the opportunity to learn about the Christian faith.
*1123 The last caveat reflects the fact that World Vision does not proselytize. Its services are made available to people of all faiths or of no faith. Indeed, World Vision claims that to do otherwise “would be contrary to its theology.” Instead, the organization explains that it attempts to express its “Christian witness ... in holistic ways through ... ministries of relief, development, advocacy and public awareness.” Humanitarian services are thus provided without strings attached, though World Vision operates numerous religious programs for those who express interest.
This review of undisputed evidence in the record readily shows that World Vision continues to conform to its founding documents, conducting “Christian religious and missionary services” and “rendering] Christian service, both material and spiritual to the sick, the aged, the homeless and the needy.” Indeed, that is essentially all World Vision appears to do. Such continued devotion to the organization’s founding aims stands in stark contrast to the, situation in Kamehameha, where “the purpose and emphasis of the [s]chools ha[d] shifted over the years from providing religious instruction to equipping students with ethical principles.” 990 F.2d at 462.
I am not persuaded by the Employees’ claim that World Vision is acting inconsistently with its mission because it does not confine its relief efforts to coreligionists. According to World Vision, providing humanitarian aid to all in need, regardless of religious belief, is a tenet of its faith. See supra pp. 1121. The Employees thus ask us to require World Vision to act contrary to such belief in order to qualify for the exemption. The plaintiff in LeBoon raised a similar argument, which the Third Circuit properly discounted.
We disagree with LeBoon’s contention that the [community center’s] willingness to welcome Gentile members and even to host Hindu services is incompatible with the view that the [center] was a religious organization. Indeed, these characteristics are clearly tied to some of the Jewish principles that guided the [center].... We will not deprive the [center] of the protection of [section 2000e-l] because it sought to abide by its principles ... through extending its welcome to non-Jews.
LeBoon, 503 F.3d at 230. I agree with the D.C. Circuit that to confine an exemption “to religious institutions with hardnosed proselytizing, that limit their enrollment to members of their religion ... is an unnecessarily stunted view of the law.” Great Falls, 278 F.3d at 1346 (citing Larson, 456 U.S. at 244, 102 S.Ct. 1673)).[19]
Moreover, the Employees’ argument would lead to absurd results. Hosts of religious organizations — including such obviously religious entities as churches or synagogues — open their doors to all. They provide religious instruction, counseling, prayer, and a variety of other services without concern for whether the individual requesting such services is a coreligionist. Adopting the Employees’ standard compels the conclusion that this inclusivity cuts against an entity’s ability to qualify for the section 2000e-l exemption. Thus, the fact that World Vision provides its services without condition does not suggest it is ineligible for the exemption.
4
I next ask whether World Vision holds itself out to the public as a religious organization. Even the Employees concede this point. They could do little else. World *1124 Vision makes no effort to disguise its Christian nature.
At the most basic level, World Vision’s logo is a stylized Christian cross, and religious artwork and texts are displayed throughout the organization’s campus. Much more significantly, World Vision disseminates Christian Messaging Guidelines within the organization to “guide” “[external communications.” The Guidelines state that World Vision “is intentional about communicating [its] Christian faith accurately and with integrity”: “[i]n a world where many institutions have moved away from their Christian roots,[World Vision] remain[s] committed to living outfits] faith through [its] work.” The organization requires that “[a]t a minimum, World Vision’s descriptor statement must be on every piece of communication.”[20] Furthermore, “World Vision always identifies itself as a Christian organization.” In reviewing external communications, employees are to ask themselves, ‘Would anyone who read this know that World Vision is a Christian organization?” They are also instructed: “[Conveying the organization’s Christian nature is] NOT AN ADD-ON. Because we demonstrate our faith through life, deed, word, and sign, our Christian witness is integrated into all that we do. Christian witness should be communicated as part of everything World Vision does.”
This overt Christianity is especially evident to those applying for employment at World Vision. For example, the following appears on the World Vision’s “Careers” webpage:
Who we are:
Motivated by our faith in Jesus, we serve the poor as a demonstration of God’s unconditional love for all people. Our faith is at the heart of all we do. Foundational to our work is the commitment to a shared faith by staff, volunteers and interns, and a common understanding of how that faith is lived out day-to-day.
Who you are:
You are a committed Christian eager to put your faith into action every day as you use your life to make a tangible difference for children in need. You recognize the importance of working together with diverse partners — including individuals, churches, corporations, and governments — to help build a better world in which all people are free from oppression, where peace and justice flourish, and where the most vulnerable live in confidence.
You are an experienced, results-oriented professional excited at the prospect of using the unique gifts and talents God has given you to help children and families in need. World Vision U.S. hires only those who agree to and accept its Statement of Faith and/or the Apostles’ Creed.[21]
*1125 All employees who are offered positions with the organization are presented an offer letter containing the text of Romans 8:28 (“And we know that God causes all things to work together for good to those who love God, to those who are called according to HIS purpose.”). While prospective employees are not required to belong to a particular Christian denomination, applicants are specifically requested to describe their “relationship with Jesus Christ.” They are also informed that employment is contingent upon “agreement and compliance with” World Vision’s Statement of Faith and/or the Apostles’ Creed, as well as World Vision’s Core Values and Mission Statement. The prospective employee must acknowledge that she has “received, read, and discussed the[se] documents, and ... subscribe^], wholeheartedly, to the principles inherent therein.”
In a case such as this, where an organization “holds itself out publically as a religious institution,’[w]e cannot doubt that [it] sincerely holds this view.’ ” Great Falls, 278 F.3d at 1344 (alterations in original) (quoting Boy Scouts of Am. v. Dale, 530 U.S. 640, 653, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000)).
5
I reluctantly comment on the fact that World Vision is not associated with any particular church or denomination and no representative of such an entity serves on World Vision’s board of directors and only do so because our precedent compels such an inquiry. The Employees contend that this lack of affiliation is fatal to World Vision’s attempt to qualify for the section 2000e-l exemption. See LeBoon, 503 F.3d at 226; Kamehameha, 990 F.2d at 461. Because, as explained above, such a conclusion would impermissibly discriminate amongst religious institutions, I cannot agree with this assertion. See supra Part II.A.2.b.
I also observe that in LeBoon, the Jewish community center at issue was neither wholly nor partially owned by a synagogue. Instead, the Third Circuit’s affiliation analysis discussed the center’s “close and active ties” with “three local synagogues,” its reliance “on coreligionists for financial support,” and its inclusion of three rabbis “in management decisions.” LeBoon, 503 F.3d at 227-29.
Applying this analysis, there is ample evidence in the record to indicate that World Vision receives a large portion of its funding from coreligionists: both from individuals and from churches. World Vision solicits donations from the general public on its website for, inter alia, individual children, “Disaster Response,” “Clothing for Children,” “Africa Food Aid,” “Hope for Sexually Exploited Girls,” and “Seeds, Tools, and Training in Africa,” While these individual web links do not necessarily make explicit reference to World Vision’s religious nature, fundrais-ing letters do contain descriptions of the organization’s Christian character. In recent years, approximately eighty-four percent of World Vision’s cash contributions have come from churches and coreligionists.
World Vision also “maintains close and active ties” with a host of “formally religious” institutions. Currently, ten members of its Board of Directors come from “church and ministry leadership,” a category that “must” be represented. Moreover, it is undisputed that World Vision is affiliated with WVI, an organization classified as a “church” for tax purposes by the IRS.[22]
*1126 6
Because the Employees concede this point, I also find it appropriate briefly to note that World Vision includes prayer or other forms of worship in its activities. LeBoon, 503 F.3d at 226. This concession is also confirmed by overwhelming, undisputed evidence in the record.
According to World Vision, because it “believes the key to faithfully following Christ lies first in the hearts and minds of [its] staff and only then in program activities,” religion pervades the workplace.[23] New employees participate in a two-day orientation which begins with daily devotionals and “focuses on serving Christ as the motivation for serving the poor.” Through the “Faith@Work” program, World Vision employees are “strongly encouraged” to attend weekly chapel services; daily devotional activities are held within each department; prayer requests are circulated amongst coworkers; Biblical “themes” are emphasized annually, quarterly, and monthly; and an entire work day is set aside each year for prayer.[24]
C
Based on the foregoing consideration of “[a]ll significant religious and secular characteristics,” I am satisfied that World Vision has met its burden of showing that the “general picture” of the organization is “primarily religious.” World Vision is a nonprofit organization whose humanitarian relief efforts flow from a profound sense of religious mission. That mission is evinced in the organization’s founding documents. Significantly, World Vision continues to act in accordance with those documents, and it explicitly and intentionally holds itself out to the public as a religious institution. While World Vision is neither owned by nor affiliated with a formally religious entity in the traditional sense, this does not preclude our finding that it is a “primarily religious” organization and thus eligible for the section 2000e-l exemption.
IV
The district court’s grant of summary judgment to World Vision is
AFFIRMED.

. That is, the Christian doctrine which, as stated by World Vision, describes God the Father, Jesus Christ, and the Holy Spirit as three persons but one being.

. Because World Vision has not relied on any constitutional right to hire and fire on the basis of religion, we do not comment on that possibility.

.The nature of the Employees’ duties is irrelevant to our analysis. If World Vision qualifies for the exemption, it is entitled to terminate employees for exclusively religious reasons, without respect to the nature of their duties. See 42 U.S.C. § 2000e-l(a).

. Similarly unavailing is any reliance on Townley's statement that "the central function of section 702 has been to exempt churches, synagogues, and the like, and organizations closely affiliated with those entities.” 859 F.2d at 618. The statement was merely descriptive in nature: it followed a string citation and summarized the manner in which the exemption had been applied. See id.

. Our dissenting colleague would also embrace such a narrow interpretation. She con-lends that the terms "religious association,” “religious corporation,” and "religious society” are all synonyms for "church.” Dissent at 1135-41. This interpretation "is ... at odds with one of the most basic interpretive cannons, that ‘[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.' ” Corley v. United States, - U.S. -, 129 S.Ct. 1558, 1566, 173 L.Ed.2d 443 (2009) (second alteration in original) (quoting Hibbs v. Winn, 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004)).

. We acknowledge that this “primarily religious” test is in tension with precedent from outside our circuit which has struck down related tests in different contexts. See Colo. Christian, 534 F.3d at 1250 (striking down a state statute which provided "scholarships to eligible students who attend any accredited college in the state — public or private, secular or religious — other than those the state deems ‘pervasively sectarian’ ” (emphasis added)); Great Falls, 278 F.3d at 1343 (striking down an inquiry which "boil[ed] down to 'is [an entity] sufficiently religious' ").

. It is true that courts sometimes must decide whether a statute has the purpose of advancing or inhibiting religion. See, e.g., Zelman v. Simmons-Harris, 536 U.S. 639, 648-49, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002); Stone v. Graham, 449 U.S. 39, 40-41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980). This inquiry, however, only asks courts to interpret statutes, not whether particular practices have religious meaning. Likewise, courts are certainly competent to decide whether an individual's religious beliefs are sincerely held. See Hernandez v. Comm’r, 490 U.S. 680, 693, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). This determination focuses on the credibility of the individual's testimony, not on the religious or nonreligious nature of his actions. Thus, there is no merit to the dissent’s assertion that courts adjudicating constitutional claims evaluate an individual's actions to "distinguish! ] between the religious and the secular." Dissent at 1145.

. The same is true for factors which aslc this court to determine whether an organization includes “prayer” or “worship” in its activities, or whether it disseminates a "religious” curriculum. While these questions are relatively easy in some contexts, they might prove more difficult when dealing with religions whose practices do not fit nicely into traditional categories. In such a scenario, it is questionable whether a court is competent to distinguish religious speech (or instruction) from other activities. Cf. Widmar v. Vincent, 454 U.S. 263, 269 n. 6, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (noting, in a free speech case, that a distinction between particular types of religious speech would lack "intelligible content”).

. This consideration would cut against entities formed by an appreciable portion of the population. According to a 2000 Harris poll, non-denominational Protestants make up 7.7 percent of the U.S. population. See Largest Religious Groups in the USA, http://www. adherents.com/rel — USA.html# families (last visited Aug. 12, 2010).

. Making a finding of religiosity contingent on receipt of support from coreligionists could also raise constitutional issues in that it might burden a religious institution's ability to raise revenue. For example, an entity in need of funds might be hesitant to solicit donations from secular sources if such solicitation would deny it section 2000e-l eligibility-

. We did remark that the "[s]choo!s’ purpose and character is primarily secular, not primarily religious.” Kamehameha, 990 F.2d at 464. We reached this conclusion by assessing whether the quantum of admittedly religious activity at the schools was sufficient to demonstrate that the schools’ purpose was primarily secular. We did not assess whether any particular activity was religious in nature. See id. at 461-63.

. Again, neither Townley, Kamehameha, nor LeBoon give any advice on how we are to weigh the various factors, except to say that their significance could vary from case to case. See LeBoon, 503 F.3d at 227.

. In Amos, the Supreme Court expressly left open the question of whether a for-profit entity could ever qualify for a Title VII exemption. 483 U.S. at 349, 107 S.Ct. 2862 (O’Con-nor, J., concurring).

. Justice Brennan would have gone so far as to impose a "categorical exemption for nonprofit activities.” Amos, 483 U.S. at 345, 107 S.Ct. 2862 (Brennan, J., concurring).

. For the reasons detailed above, I do not consider the Employees’ argument that World Vision’s stated mission is humanitarian, and thus secular in nature. See supra Part II. A.2.b.

. Some relevant selections include the following:
We are Christian!:] We acknowledge one God: Father, Son and Holy Spirit. In Jesus Christ the love, mercy and grace of God are made known to us and all people. From this overflowing abundance of God’s love we find our call to ministry.
We proclaim together, “Jesus lived, died and rose again. Jesus is Lord.” We desire *1122 him to be central in our individual and corporate lives.
We seek to follow him — in his identification with the poor, the afflicted, the oppressed, the marginalised; in his special concern for children; in his respect for the dignity bestowed by God on women equally with men; in his challenge to unjust attitudes and systems; in his call to share resources with each other; in his love for all people without discrimination or conditions; in his offer of new life through faith in him. From him we derive our holistic understanding of the gospel of the kingdom of God, which forms the basis of our response to human need.

. World Vision’s self-stated "Mission,” and "day-to-day reason for being" is "[t]o call people to a life-changing commitment to serve the poor in the name of Christ.”

. These “Core Characteristics” are designed to provide staff guidance. Each characteristic is linked to a particular verse from the Bible.

. Not to mention that this would again raise considerations of discrimination among religious institutions: here, between groups that engage in “hard nosed proselytizing” and those that do not. See supra Part II.A.2.b.

. The following is an example of the "descriptor statement":
World Vision is a Christian humanitarian organization dedicated to working with children, families, and their communities worldwide to reach their full potential by tackling the causes of poverty and injustice. Motivated by our faith in Jesus Christ, we serve along side the poor and oppressed as a demonstration of God’s unconditional love for all people. World Vision serves all people, regardless of religion, race, ethnicity or gender.

. The Apostles' Creed, as it appears on World Vision's website, reads as follows:
I believe in God, the Father almighty, creator of heaven and earth. I believe in Jesus Christ, God's only Son, our Lord, who was conceived by the Holy Spirit, born of the Virgin Mary, suffered under Pontius Pilate, was crucified, died, and was buried; he descended to the dead. On the third day he rose again; he ascended into heaven, he is seated at the right hand of the Father, and he will come again to judge the living and the dead. I believe in the Holy Spirit, the holy catholic church, the communion of saints, the forgiveness of sins, the resurrection of the body, and the life everlasting. AMEN.

. Plaintiffs also make much of the fact that World Vision receives approximately twenty-five percent of its funds from federal grants. Apart from conclusory allegations, however, they do not explain how receipt of government funds undermines World Vision’s reli *1126 giosity or bars its classification as a religious entity.

. World Vision's website describes the workplace environment as follows: "World Vision is a community of Christians who are committed to serve the poor in the name of Christ. The staff at our U.S. headquarters represent more than 38 different Christian denominations. Our common purpose and love for Jesus Christ creates a friendly, supportive environment.”

. It is true, as Plaintiffs note, that the fact that the employees in Townley were required to attend devotional services did not preclude this court from finding the entity secular in nature. 859 F.2d at 619. The inquiry, however, is multifaceted. While the company in Townley conducted devotional services, it was also a for-profit manufacturer of an "admittedly secular product”: mining equipment. Id.