EQUAL EMPLOYMENT OPPOR-
TUNITY COMMISSION,
Plaintiff–Appellant,

v.

KAMEHAMEHA SCHOOLS/BISHOP
ESTATE, Defendant–Appellee.

No. 91–16586.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1992.

Decided March 31, 1993.

As Amended on Denial of Rehearing
May 10, 1993.

Samuel A. Marcosson, E.E.O.C., Washington, DC, for plaintiff-appellant.

James Kawashima and Cynthia Winegar, Watanabe, Ing & Kawashima, Honolulu, HI, for defendant-appellee.

Before BROWNING, NORRIS and REINHARDT, Circuit Judges.

JAMES R. BROWNING, Circuit Judge:

## I. *Overview.*

Bernice Pauahi Bishop was a member of the Hawaiian royal family and, at the time of her death in 1884, the largest landowner in Hawaii. Mrs. Bishop's will provided that the bulk of her estate should be placed in a charitable trust "to erect and maintain in the Hawaiian Islands two schools, each for boarding and day scholars, one for boys and one for girls, to be known as, and called the Kamehameha Schools." Mrs. Bishop's will also directed that "the teachers of said schools shall forever be persons of the Protestant religion."[1]

Carole Edgerton, who is not a Protestant, contacted the Schools to apply for an advertised position as a substitute French teacher. Edgerton was informed of the Protestant-only requirement and filed a charge of religious discrimination with EEOC. EEOC attempted conciliation, but the Schools informed the Commission they were bound by Mrs. Bishop's will.

EEOC filed suit, alleging religious discrimination in employment in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).[2] The Schools conceded Mrs. Bishop's will requires discrimination in employment contrary to § 2000e-2(a)(1), but sought to bring themselves within three exemptions provided elsewhere in the Act: (1) § 2000e-1, which provides that the equal employment provisions of the Act do not apply to employment by a "religious ... educational institution" of individuals of a particular religion to carry on its activities; (2) § 2000e-2(e)(1), which provides that "it shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of [] religion" if religion is "a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise;" and (3) § 2000e-2(e)(2), which provides that "it shall not be an unlawful employment practice for a school ... to hire and employ employees of a particular religion ... if the curriculum of such school ... is directed toward the propagation of a particular religion."

The parties agreed to litigate the applicability of the three exceptions before considering the merits of Edgerton's claim. EEOC and the Schools filed cross-motions for summary judgment. The district court found the Schools exempt on all three grounds. *EEOC v. Kamehameha*

---

1. The provision reads:
   I give, devise and bequeath all of the rest, residue and remainder of my estate ... unto the trustees below named ... to erect and maintain in the Hawaiian Islands two schools, each for boarding and day scholars, one for boys and one for girls, to be known as, and called the Kamehameha Schools.... I direct my trustees ... to expend the annual income in the maintenance of said schools ... and to devote a portion of each year's income to the support and education of orphans, and others in indigent circumstances, giving the preference to Hawaiians of pure or part aboriginal blood.... I desire my trustees to provide first and chiefly a good education in the common English branches, and also instruction in morals and in such useful knowledge as may tend to make good and industrious men and women; and I desire instruction in the higher branches to be subsidiary to the foregoing objects.... I also give unto my said trustees full power to make all such rules and regulations as they may deem necessary for the government of said schools and to regulate the admission of pupils.... I also direct that the teachers of said schools shall forever be persons of the Protestant religion, but I do not intend that the choice be restricted to persons of any particular sect of Protestants.

2. 42 U.S.C. § 2000e-2(a)(1) provides:
   It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]

*Schools/Bishop Estate,* 780 F.Supp. 1317 (D.Haw.1991).

Ordinarily, "[w]e review the district court's grant of summary judgment *de novo.*" *EEOC v. Townley Eng. & Mfg. Co.,* 859 F.2d 610, 613 (9th Cir.1988). However, here we are reviewing, at least in part, conclusions of ultimate fact reached by a district court when granting summary judgment in a non-jury case. We need not decide whether a different standard of review applies with respect to such conclusions; the result would be the same whether we applied a *de novo* or clearly erroneous standard.

We construe the statutory exemptions narrowly, *Korherr v. Bumb,* 262 F.2d 157, 162 (9th Cir.1958), and the Schools bear the burden of proving they are exempt, *see United States v. First City Nat'l Bank,* 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967) (party seeking benefit of exemption from statute bears burden of proof); *EEOC v. Boeing Co.,* 843 F.2d 1213, 1214 (9th Cir.1988) (party seeking benefit of bona fide occupational qualification exception bears burden of proof).

We conclude the Schools failed to establish their entitlement to any of the three exemptions claimed, and reverse.

## II. *Exemption for Religious Educational Institutions.*

■ The district court weighed the religious characteristics of the Schools against their secular characteristics and concluded the Schools were exempt under § 2000e–1 as religious educational institutions because the purpose and character of the Schools is primarily religious.[3] 780 F.Supp. at 1324–26. In applying § 2000e–1 the district court adopted the approach approved by this court in *Townley,* 859 F.2d at 618, of weighing "[a]ll significant religious and secular characteristics ... to determine whether the corporation's purpose and character are primarily religious." We reaffirm that approach. We differ from the district court only in evaluating the facts of this case in light of Congress' intention as to the scope of the exemption for religious organizations.

■ We stated in *Townley* that § 2000e–1 does not exempt an institution that is "merely 'affiliated' with a religious organization." *Id.* at 617. We also observed, "Congress's conception of the scope of [§ 2000e–1] was not a broad one. All assumed that only those institutions with extremely close ties to organized religion would be covered. Churches, and entities similar to churches, were the paradigm." *Id.* at 618.[4] We then held that, in determining whether an institution falls within the limited exemption for religious institutions under § 2000e–1, "each case must turn on its own facts. All significant religious and secular characteristics must be weighed to determine whether the corporation's purpose and character are primarily religious. Only when this is the case will the corporation be able to avail itself of the exemption." 859 F.2d at 618. "Our inquiry here," we said, "is to determine whether the 'general picture' of the institution is primarily religious or secular." *Id.* at 619 n. 14.[5]

---

3. 42 U.S.C. § 2000e–1 reads:
   This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, *educational institution,* or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities. (emphasis added)

4. Specific exemptions for schools owned, supported, controlled, or managed by a particular religion, or whose curricula are dedicated toward the propagation of a particular religion were included in the original statute because of the perceived narrowness of the exemption for religious corporations in § 2000e–1. *See* 42 U.S.C. § 2000e–2(e)(2); *Townley,* 859 F.2d at 617.

5. *Townley* relied in part on an examination of the legislative history of the original version of § 2000e–1, which contained separate exclusions for (1) religious discrimination relating to the religious activities of a religious corporation, association, or society, and (2) discrimination on any basis relating to the educational activities of an educational institution. *Townley* did not discuss the legislative history of the 1972 amendments to § 2000e–1, which eliminated the separate exemption for educational institutions, added "religious ... educational institutions" to

■ The ownership and affiliation, purpose, faculty, student body, student activities, and curriculum of the Schools are either essentially secular, or neutral as far as religion is concerned,[6] and we conclude the general picture of the Schools reflects a primarily secular rather than a primarily religious orientation.

1. *Ownership and Affiliation*—No religious organization has ever controlled or supported the Schools, and the Schools are not affiliated with any denomination of Protestants or with any organization or association of religious schools.[7] The Schools are a part of the Bishop Trust, which is a large and overwhelmingly secular business. Recent annual reports for the Bishop Estate make no mention of religion. Recent annual reports by the Schools to the trustees mention religion only as a form of "ancillary support." [8]

the list of exempt religious organizations, and expanded the religious exemption to include employees engaged in non-religious activities. However, nothing in the 1972 legislative history causes us to question the approach the court adopted in *Townley*. These materials suggest only that Congress felt strongly that the exemption that had been available to all educational institutions should be narrowed to religious discrimination by religious educational institutions, but that religious institutions, including religious schools, should be allowed to discriminate on the basis of religion in all their activities. *See, e.g.*, H.Rep. No. 238, 92nd Cong., 1st Sess. (1971), *reprinted in* 1972 U.S.C.C.A.N. 2137, 2155, and Bureau of National Affairs, *The Equal Employment Opportunity Act of 1972* 155, 173 (1973); S.Rep. No. 415, 92nd Cong., 1st Sess. (1971), *Equal Employment Opportunity* at 225, 235–36; 118 Cong. Rec. 946 (Jan. 24, 1972) (statement of Sen. Allen, sponsor of amendment to allow religious organizations to discriminate on basis of religion in all their activities), *Equal Employment Opportunity* at 335; *id.* at 4941 (Feb. 22, 1972) (section by section analysis of Senate bill by Sen. Williams, sponsor of the bill), *Equal Employment Opportunity* at 314. It would frustrate this purpose in part to allow educational institutions with limited religious ties to gain exemption as "religious educational institutions."

In any event, the test the court adopted in *Townley* does not depend on an analysis of legislative history. Although the statute does not define the term "religious educational institution," it is clear from its context that, at least where the school is not owned by a church, the courts must determine in each case whether a particular educational institution is a religious organization. Therefore the case by case inquiry described in the text is the appropriate method for determining whether § 2000e–1 applies to the Schools.

6. The record does not disclose many details about the administration of the Schools. Mrs. Bishop's will requires that the trustees be Protestants, and grants the power of appointing them to the justices of the Hawaii Supreme Court. There is no requirement that other administrative positions be filled by Protestants, and there is nothing in the record to indicate that the Schools' administration reflects a Protestant perspective, or has organized the Schools so as to promote Protestant beliefs. Indeed, the record reveals recent generations of administrators have shifted the focus of the Schools away from promoting religion.

7. The Schools maintain a cooperative relationship with the Bishop Memorial Church, which receives financial support from the Bishop Estate and is a member of the Hawaii Conference of the United Church of Christ. However, the Schools themselves are not affiliated with the Church of Christ, and the parties stipulated that no Protestant denomination, including the Church of Christ, "owns, supports, controls or manages, in whole or significant part, the Bishop Estate or the Kamehameha Schools."

In view of the narrow reach of the § 2000e–1 exemption, it is not surprising that we have found no case holding the exemption to be applicable where the institution was not wholly or partially owned by a church. *See Little v. Wuerl*, 929 F.2d 944 (3d Cir.1991) (parochial school operated by parish); *EEOC v. Fremont Christian School*, 781 F.2d 1362 (9th Cir.1986) (school wholly owned and operated by Assembly of God Church); *Rayburn v. Gen. Conf. of Seventh Day Adventists*, 772 F.2d 1164 (4th Cir. 1985) (sex discrimination by a church); *EEOC v. Pacific Press Pub. Ass'n*, 676 F.2d 1272 (9th Cir.1982) (affiliated with and overseen by Seventh Day Adventist Church; published only religious materials); *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277 (5th Cir. Unit A 1981) (owned and operated by Southern Baptist Convention); *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir.1980) (owned and operated by Mississippi Baptist Convention); *see also Fike v. United Methodist Children's Home of Va., Inc.*, 547 F.Supp. 286 (E.D.Va. 1982) (exemption does not apply because the home had abandoned its sectarian orientation and become a secular organization even though it was affiliated with the Methodist Church).

8. Because the Schools are chartered as a nonprofit educational institution, not as a religious organization, EEOC argues the Schools represent themselves as secular to receive federal funding for off-campus programs. Congress apparently did not intend that an institution's charter should carry much weight in determining whether an institution is religious. *See* 110 Cong.Rec. 2585 (Feb. 8, 1964) (statement of Rep. Purcell) ("most church-related schools are char-

2. *Purpose*—In the advertisement for a substitute French teacher that gave rise to this litigation, the Schools described themselves as "Protestant." However, the record reveals the purpose and emphasis of the Schools have shifted over the years from providing religious instruction to equipping students with ethical principles that will enable them to make their own moral judgments. A 1955 School Survey Report lauded the "aim of developing in the students an attitude of worship and reverence." By 1961, the Schools' Introductory Pamphlet described religion as "a powerful influence for the stabilizing of personality," and asserted religious education at the Schools "seeks to provide an atmosphere in which young people accept as their own the finest ideals of conduct; and in cases where problems have arisen, to show moral and spiritual standards by which the students can set up inward guidance to correct their problems." The 1989–90 Course Catalog states each student "will be expected to develop to the best of his or her ability, skills needed to relate positively to self and others, maintain health, continue learning, enrich existence and participate in contemporary society for a rewarding and productive life." Students should "[d]efine a system of values which reflects positive feelings about self and others and awareness of the rights and responsibilities of the individual within society." [9]

3. *Faculty*—The Schools have consistently adhered to the Protestant-only requirement for on-campus teachers, although there is no religious requirement for teachers in off-campus programs. Until 1988, the Schools required prospective teachers to present a baptismal record or letter of membership reflecting affiliation with a Protestant church, but now require only that teachers certify their "membership in the Protestant religion." The Schools have never required their teachers to maintain active membership in a church, and do not inquire into the substance of a teacher's beliefs or the extent to which teachers integrate those beliefs into their work. Of the two hundred and fifty full-time on-campus faculty members, only three, including the Chaplain, have specific religious teaching duties. The Chaplain teaches religious education and serves as pastor of the Bishop Memorial Church, which is located on campus in a structure owned by the Schools. With the exception of religious education, the Chaplain has no authority over the curriculum.

4. *Student Body*—The Schools enroll more than 3,000 boarding and day students in kindergarten through twelfth grade; more than two-thirds of whom attend grades seven through twelve. The Schools operate off-campus programs for more than 16,000 additional students and administer community outreach programs for another 20,000 Hawaiians. The Schools do not consider the religious affiliation of prospective students on or off campus, or of the persons participating in outreach programs. Less than one-third of the "on-campus" students are Protestants.

5. *Student Activities*—Students participate in a wide variety of activities, including interscholastic athletics, canoe and weightlifting clubs, the Future Secretaries Association, and French Club. As at public and private schools across the nation, students may participate in Bible studies, or become members of the Fellowship of Christian Athletes and Young Life (an inspirational society for high school students).

Some official school activities have religious overtones. Teachers in kindergarten through eighth grade lead their classes in a daily prayer, and all boarders say grace before dinner. Athletic teams pray before games, and the School's daily bulletin usually reprints a Bible verse. The Bishop Memorial Church holds services every Sunday during the school year which all boarding students must attend (however, no students and only nineteen of faculty were members of the church during the 1988–89 school year). The Chaplain and the church coordinate "deputation teams" of students

---

tered under the general corporation statutes as nonprofit institutions for the purpose of education"), *reprinted in* EEOC, *Legislative History of Titles VII and XI of Civil Rights Act of 1964* 3197 (1968); *see also Pime v. Loyola Univ. of Chicago,* 803 F.2d 351, 358 (7th Cir.1986) (Posner, J., concurring).

**9.** We discuss the purpose of the Schools in further detail in section IV, *infra.*

from the Schools who lead services several times a year on other islands, although the number of students and the number of visits has decreased over the years. Other mandatory school functions—such as Founder's Day, Baccalaureate, and Graduation—include prayer and hymns in addition to celebrations of Hawaiian culture. Another mandatory function—the Song Contest—seeks "to build up the repertoire of the best in Hawaiian music for the cultural heritage of any student who attends Kamehameha."

6. *Curriculum*—The Schools describe themselves as "a comprehensive school" with "programs in vocational, business, and college preparatory fields." They offer a complete array of courses in math, science, English, languages, and social studies, all of which are taught from a secular perspective. No effort is made to instruct students in Protestant doctrine, and the Schools have explicitly disavowed any effort to convert non-Protestant students. However, the Schools require each student to fulfill a limited religious education requirement, as described below.

Religious instruction in kindergarten through sixth grade is provided by a religious education teacher and consists of Bible stories, religious songs, and prayer for 15–30 minutes once a week for one semester. The present teacher describes her work as "an important opportunity to expose children to the Christian faith. The emphasis is not on any 'religion' but to teach the basic truths about how God and through his son Jesus Christ teaches us how to live a joyous and fulfilling life."

Religious education in the upper grades exposes students to the comparative study of religions, and to the place religion has held in Hawaiian culture and history. Seventh and eighth graders spend 10–14 hours a year in religious education classes. The single course offered to seventh grade students is described as involving an examination of "The Nature of 'God,'" "The Na-

ture of Man," and "The Nature of Religion." The course description defines "God" as "the center, focus and object of any belief system, whether person, idea or spirit," and defines "religion" as "a structure that attempts to overcome the separation between Man and 'God,' and to teach man how this can be achieved." The eighth grade course explores the historical development and beliefs of "Hinduism, Buddhism, Judaism, Christianity and Islam."

High school students must complete the requirements of the "Ekalesia" program, which includes coursework and mandatory attendance at devotional services every other week.[10] In 1988–89, the course included study of "the Kumulipo, the Hawaiian creation chant, ... [with] a comparative look at the creation chants of other religions," and an "historical study approach to three major Christian faiths [Congregationalism, Catholicism, and the Church of Jesus Christ of Latter–Day Saints] that have impacted on the Hawaiian people and the Hawaiian society today." In 1987–88 students studied "the Hawaiian and Christian heritage" of the Schools, and examined "the Congregational missionaries and their impact upon the life and culture of the Hawaiian Kingdom." In addition to "Ekalesia," the Schools offer high school students an elective class on the Bible as literature.

\* \* \* \* \* \*

In sum, the religious characteristics of the Schools consist of minimal, largely comparative religious studies, scheduled prayers and services, quotation of Bible verses in a school publication, and the employment of nominally Protestant teachers for secular subjects. References to Bible verses, comparative religious education, and even prayers and services are common at private schools and cannot suffice to exempt such schools from § 2000e–1; the addition of nominally Protestant teachers does not alter this conclusion. We conclude the Schools are an essentially secular institution operating within an historical tradition

---

**10.** In 1988–89, students were expected to complete one quarter of Ekalesia coursework each year. The Schools modified the coursework component in 1989–90 so that only freshmen were required to complete one quarter of coursework, although all students were still required to attend devotions. The record does not disclose the form or content of the devotional services.

that includes Protestantism, and that the Schools' purpose and character is primarily secular, not primarily religious.[11]

### III. *Religious Curriculum Exemption.*

█ The curriculum exemption in 42 U.S.C. § 2000e–2(e)(2) provides:

it shall not be an unlawful employment practice for a school ... to hire and employ employees of a particular religion ... if the curriculum of such school ... is directed toward the propagation of a particular religion.

The district court ruled the Schools satisfied the requirements of this section because " 'religion ... is an integral part of the child's daily life' " at the Schools. 780 F.Supp. at 1327 (quoting EEOC Decision 75–186 (1975), *reprinted in* 1983 EEOC Decisions ¶ 6553, at 4356).

We turn first to the language of § 2000e–2(e)(2). The statute does not define "propagate" or "curriculum," but in the context of § 2000e–2(e)(2) and in light of their ordinary meanings, "propagate" carries at least the general meaning of spreading or instilling particular religious values, while "curriculum" is limited to coursework and required school activities.[12]

Sec. 2000e–2(e)(2) was added to the statute by floor amendment; its legislative history is limited and does not change our understanding of the meaning of the term "religious curriculum." Representative Purcell offered the amendment and stated it was "limited to church affiliated colleges and universities, part of whose mission ... is to propagate the belief of the denomination that is supporting that educational institution." 110 Cong.Rec. 2585–86 (Feb. 8,

1964), *reprinted in* EEOC, *Legislative History of Titles VII and XI of Civil Rights Act of 1964* 3198 (1968). Representative Roush declared such a school "should have the right to compel the individuals it employs to adhere to its beliefs, for that [school] exists to propagate and to extend to the people with whom it has influence its convictions and beliefs." *Id.* at 2587, *Legislative History* at 3201. Representative Edmondson indicated the exemption was intended to apply to "a college that is dedicated primarily to the propagation of its faith." *Id.* at 2590, *Legislative History* at 3206. Although these comments do not address the meaning or scope of the curriculum exemption directly, they are consistent with our conclusion that Congress did not anticipate schools that disavow any effort to instill particular religious beliefs in their students would come within the exemption.

There is no case law on the curriculum exemption. EEOC has interpreted the provision in only one ruling, EEOC decision 75–186, *reprinted in* 1983 EEOC Decisions ¶ 6553. This decision rested primarily on the ground the school involved was wholly owned, supported, controlled, and managed by a church and therefore was expressly exempt under § 2000e–2(e)(2) whether or not it also fell within the curriculum exemption.[13] The opinion's limited references to the curriculum exemption are not inconsistent with our own understanding that application of this exemption is to be determined by an essentially fact-based inquiry into the extent to which a school's curriculum reflects an effort to spread and inculcate particular religious beliefs.

---

**11.** The Schools contend we should consider prior decisions by EEOC regional offices not to charge the Schools with religious discrimination. However, the Schools concede these decisions do not estop EEOC, and there is no indication the regional offices had the benefit of the record compiled during this litigation.

**12.** *Webster's Ninth New Collegiate Dictionary* (1990) defines "curriculum" as "the courses offered by an educational institution" or "a set of courses constituting an area of specialization." The Oxford English Dictionary (2d ed. 1989) defines it as "a regular course of study or training, as at a school or university." Webster's

defines "propagate" as, "to cause to spread out and affect a greater number or greater area." The Oxford English Dictionary defines it as, "To extend ... To spread from person to person, or from place to place; to disseminate, diffuse."

**13.** 42 U.S.C. § 2000e–2(e)(2) also provides an exemption for religious discrimination by an educational institution that is "in whole or substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society." The Schools do not contend they come within this exemption.

As we have noted, the curriculum of the Schools has little to do with propagating Protestantism, especially in grades 7–12. Seventh and eighth grade students study the nature of religious belief and the tenets of major faiths, and high school students take a one quarter course exploring the interrelationship of western religions and Hawaiian culture, but efforts to propagate Protestantism are not evident in this or any other coursework or in required activities of the Schools. Courses *about* religion and a general effort to teach good values do not constitute a curriculum that propagates religion, especially in view of the Schools' express disclaimer of any effort to convert their non-Protestant students. The Schools' publications demonstrate religion is more a part of the general tradition of the Schools than a part of their mission, and serves primarily as a means for advancing moral values in the context of a general education.

### IV. *Bona Fide Occupational Qualification.*

■ The district court concluded that adherence to the Protestant faith was a bona fide occupational requirement for teaching at the Schools and therefore the Schools were exempt under § 2000e–2(e)(1).[14]

EEOC and the Schools stipulated there is nothing "specific about the subject matter of any given teacher position ... that would make a teacher being Protestant a bona fide occupational qualification"

[BFOQ].[15] EEOC claims this stipulation is dispositive in light of the holding in *U.A.W. v. Johnson Controls, Inc.*, 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991), that to qualify as a BFOQ a discriminatory job qualification must "affect an employee's ability to do the job," and "must relate to the 'essence' or to the 'central mission of the employer's business.'" *Id.* 499 U.S. at ——, 111 S.Ct. at 1205 (citations omitted). The Protestant-only requirement, EEOC argues, has no relationship to a teacher's ability to perform the job of teaching secular subjects—in this case, the French language.

The district court held the requirement related to the teachers' ability to perform their job because "the essence or central mission of [the Schools] is to provide native Hawaiians with an education from the Protestant point of view.... Similarly, the essence or central mission of the teachers' jobs is to provide that viewpoint." 780 F.Supp. at 1323. The district court defined the central mission of the Schools too narrowly. The record demonstrates the Schools have embraced a broad mandate to help native Hawaiians "participate in contemporary society for a rewarding and productive life" by providing a solid education in traditional secular subjects, instruction in Hawaiian culture and history, and the moral guidance necessary to help students "[d]efine a system of values."[16] The requirement of Protestant affiliation in a teacher's past is largely irrelevant to this mission. There is no basis in the record for

---

**14.** 42 U.S.C. § 2000e–2(e)(1) reads in part:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of [ ] religion ... in those certain circumstances where religion ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

**15.** The stipulation reads:

[The Schools] contend[ ] that the Will of Mrs. Bishop by its language creates a bona fide occupational qualification for all teachers to be of the Protestant religion in order that there be a Protestant presence at Kamehameha Schools. [The Schools are] not contend-

ing that, apart from their status as teachers generally, there is anything specific about the subject matter of any given teacher position (such as English, science, mathematics) ... that would make a teacher being Protestant a bona fide occupational qualification within the meaning of this exemption.

EEOC concedes that being Protestant is a bona fide occupational qualification for the Chaplain, Associate Chaplain, and religious education teachers.

**16.** This description of the Schools' purpose is consistent with Mrs. Bishop's desire that the Schools "provide first and chiefly a good education in the common English branches, and also instruction in morals and in such useful knowledge as may tend to make good and industrious men and women." *See* note 1, *supra.*

concluding a nominally Protestant teacher will provide superior instruction or serve as a better moral guide to students. *See Johnson Controls*, 499 U.S. at ——, 111 S.Ct. at 1205 (employer must show "a high correlation" between a qualification and ability to perform job functions).

Except for the Schools' religious education teachers (as to whom Protestant affiliation is conceded to be a BFOQ), teachers at the Schools provide instruction in traditional secular subjects in the traditional secular way. There is nothing to suggest that adherence to the Protestant faith is essential to the performance of this job. Teachers in kindergarten through eighth grade lead their classes in prayer, but there is no evidence the Schools review the content of the prayer for conformity to Protestant doctrine or that non-Protestants are not qualified to lead students in prayer. The Schools also expect teachers to serve as role models and provide general instruction in morals, but they do not review or inquire into their teachers' personal religious life or general moral principles, and do not inquire whether the teachers integrate Protestantism into their teaching. The Schools identify no skills or aptitudes which persons affiliated with the Protestant tradition possess as a class that are essential to the performance of those job functions. Moreover, the record indicates the Protestant affiliation requirement is nominal—if a prospective teacher represents he or she is Protestant, the prospective teacher is presumed able to lead prayers and serve as a moral role model.[17]

The Schools rely on the Seventh Circuit's decision in *Pime v. Loyola Univ. of Chicago*, 803 F.2d 351 (7th Cir.1986), a case decided before *Johnson Controls*, to argue the Protestant-only requirement relates to the "essence" of the Schools because it is necessary to creation of a "Protestant presence" on campus. The district court agreed, holding "the 'Protestant presence' is significant to the educational and normal operation" of the Schools. 780 F.Supp. at 1321.

EEOC contends *Pime* is inconsistent with *Johnson Controls*. Even if *Pime* were an accurate statement of the law in light of *Johnson Controls*, however, it could not bear the weight the Schools would have it carry. *Pime* approved a Jesuit "presence" of four positions in the Philosophy Department of Loyola University, a school with "a long Jesuit tradition" and a largely Catholic student body. *Id.* at 352. The court focused on the tradition and character of the school and the desire of administrators " 'that students would *occasionally* encounter a Jesuit.' " *Id.* at 354 (emphasis added). The court stated it was "wholly reasonable to believe that the educational experience at Loyola would be different if a Jesuit presence were not maintained." *Id.*

In this case, the Schools will have a Protestant "presence" equal to or greater than the Jesuit "presence" at Loyola even if the proportion of Protestants on the faculty falls well below one hundred percent, and there is no indication the educational experience at the Schools will be any different if some of the teachers are not Protestants. Moreover, the Schools seek to retain a wholly Protestant faculty at a school whose student body has a majority of non-Protestant students and whose tradition and character is rooted more in Hawaiian history and culture than in specific principles of Protestantism.

The fact that the Protestant-only requirement appears in Mrs. Bishop's will cannot in itself alter the result. *Cf. Rosenfeld v. Southern Pacific Co.*, 444 F.2d 1219, 1225–26 (9th Cir.1971) (compliance with state law does not transform a discriminatory practice into a BFOQ). The will does not establish a religious school, nor stipulate any relevant qualifications Protestant teachers would bring to teaching positions at the Schools. The will suggests only that Mrs. Bishop was stating a personal preference based on her own experience in missionary schools. This kind of personal preference

---

**17.** The Schools do not apply the Protestant-only requirement to teachers in programs receiving federal funding, although the source of funding has no apparent relationship to the qualities required to teach such courses.

is not a BFOQ when expressed by a living employer, and there is no reason to reach a different conclusion because the preference is expressed posthumously.[18]

Reversed and remanded for entry of partial summary judgment in favor of EEOC. Each side will bear its own costs of appeal.

18. We also reject the suggestion that Mrs. Bishop's will creates a BFOQ because failure to comply with its provisions may violate Hawaii law and void the trust. Hawaii courts approved the merger of the separate boys and girls schools established by the will because a change in circumstances warranted a departure from the will. *Collins v. Tavares*, 37 Haw. 109 (1945); *see also Murray v. Kobayashi*, 50 Haw. 104, 106, 431 P.2d 940 (1967) ("Mrs. Bishop did not direct the trustees to establish religious schools"). These cases suggest Hawaii courts would also approve an involuntary departure from the Protestant-only requirement to comply with Title VII.

