**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ANN GARCIA, *Plaintiff-Appellant*, | No. 16-16827 |
| v. | D.C. No. 2:14-cv-02225-DGC |
| SALVATION ARMY, *Defendant-Appellee*. | OPINION |

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted November 13, 2018
San Francisco, California

Filed March 18, 2019

Before: Mary M. Schroeder and Paul J. Watford, Circuit
Judges, and Edward R. Korman,* District Judge.

Opinion by Judge Korman

---

* The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

# SUMMARY[**]

## Employment Discrimination

The panel affirmed the district court's summary judgment in favor of the Salvation Army, the defendant in an employment discrimination action under Title VII and the Americans with Disabilities Act.

The panel held that Title VII's religious organization exemption is not jurisdictional and is subject to procedural forfeiture. Absent prejudice resulting from the Salvation Army's failure to timely raise the defense, however, the religious organization exemption foreclosed plaintiff's Title VII claims because the Salvation Army's purpose and character were primarily religious. The panel held that the exemption does not apply only to hiring and firing decisions, but rather extends to both retaliation and hostile work environment claims.

Affirming the district court's grant of summary judgment on plaintiff's ADA claim, the panel held that there was no triable issue whether the Salvation Army failed to engage in an interactive process in good faith with the plaintiff up to the time she was cleared for work after a period of leave. After the clearance for work, the plaintiff could not show that she was disabled.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Menno Goedman (argued), Boies Schiller Flexner LLP, Washington, D.C.; Kathleen Hartnett, Boies Schiller Flexner LLP, Palo Alto, California; for Plaintiff-Appellant.

R. Shawn Oller (argued) and Ryan G. Lockner, Littler Mendelson, P.C., Phoenix, Arizona; for Defendant-Appellee.

## OPINION

KORMAN, District Judge:

The Salvation Army is an evangelical ministry founded in 1865 by William Booth, a former Methodist minister.[1] The Salvation Army's religious tenets differed from traditional Methodism in rejecting the importance of sacraments and emphasizing strong central governance.[2] To that end, Booth—"General" of the Salvation Army—

---

[1] Unless otherwise indicated, the following historical context is gleaned from the record. Otherwise—and purely for background purposes—we take judicial notice of certain historical facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see Singh v. Ashcroft*, 393 F.3d 903, 905 (9th Cir. 2004).

[2] *Protestantism*, ENCYCLOPÆDIA BRITANNICA, https://www.britannica.com/topic/Protestantism (published Dec. 13, 2018).

adopted the military-style hierarchy of the British Army[3] under which ranked officers were the equivalent of ministers.[4] In keeping with Protestantism's nineteenth century "camp revival," Booth took his ministry to the streets[5] and began establishing mission centers catering to London's poor.[6]

What started as a single ministry in the East End of London spread to the shores of the United States in 1880[7] and now operates in more than 80 countries through 16,000 evangelical centers and 3,000 social welfare institutions worldwide.[8] The Salvation Army describes itself as "an evangelical part of the universal Christian church," whose professed mission is "to preach the gospel of Jesus Christ and to meet human needs in His name without discrimination." Here in the United States, the Salvation

---

[3] *William Booth*, ENCYCLOPÆDIA BRITANNICA, https://www.britannica.com/biography/William-Booth (published Aug. 16, 2018).

[4] *Salvation Army*, ENCYCLOPÆDIA BRITANNICA, https://www.britannica.com/topic/Salvation-Army (published May 11, 2018).

[5] *Protestantism*, *supra* note 2.

[6] *Salvation Army*, *supra* note 4.

[7] *William Booth*, *supra* note 3.

[8] *Salvation Army*, *supra* note 4.

Army operates through 501(c)(3) nonprofit corporations.[9] In 2012 and 2013, direct public donations made up the lion's share of the Salvation Army's total revenue; sales to the public comprised fifteen percent.

Ann Garcia's relationship with the Salvation Army dates to 1999, when she began attending religious services at the Estrella Mountain Corps in Avondale, Arizona. In 2002, the Corps hired Garcia to work as an assistant to the pastor, a position she held until July 2010, when Arlene and Dionisio Torres became the new pastors. No longer in need of an assistant, Arlene Torres reassigned Garcia to the position of social services coordinator in January 2011. In that role, Garcia aided clients under the supervision of Arlene Torres. In late 2011, Garcia and her husband "left the Church" and stopped attending the Salvation Army's religious services, but Garcia continued her work as social services coordinator. Afterward, her relationship with Torres began to deteriorate.

Tensions reached new heights in July 2013, when a client filed a lengthy complaint letter against Garcia, claiming that she "refused to provide help to [the client's] family." After Torres informed Garcia that a complaint had been lodged, Garcia demanded to see it. Torres refused, claiming that the complaint was confidential. Three days later, Garcia filed an internal grievance of her own against Torres, claiming that she "fe[lt] discriminated against and excluded and isolated"

---

[9] We take judicial notice of the Salvation Army's nonprofit status, as reflected in the publicly available IRS determination letters at Docket Entry No. 45. *See* Fed. R. Evid. 201(b); *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) ("We may take judicial notice of records and reports of administrative bodies." (internal quotation marks omitted)).

at work ever since leaving the church. The specter of the undisclosed client grievance continued to disturb Garcia. She would go on to submit complaints to the EEOC and Arizona state authorities for religious discrimination and retaliation.

Following a lengthy period of medical leave due to fibromyalgia, the Salvation Army fired Garcia after she failed to report to work despite being cleared by her doctor. Garcia then filed a second complaint with the EEOC and state authorities alleging that, by declining to disclose the client complaint, the Salvation Army failed to accommodate her disability.

Garcia's EEOC charges were dismissed, and right-to-sue letters issued. Garcia subsequently brought two lawsuits against the Salvation Army: one under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e, *et seq.*, and another under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112, *et seq.*, which were consolidated. In sum, Garcia alleged that the Salvation Army subjected her to a hostile work environment because she stopped attending religious services and retaliated against her for filing an internal grievance complaining of religion-based mistreatment. The resulting stress precipitated health problems that the Salvation Army failed to accommodate.

The district judge (Campbell, *J.*) granted summary judgment to the Salvation Army, holding that Title VII's religious organization exemption (ROE) protects the Salvation Army from suit, even if it failed to timely assert the defense. *Garcia v. Salvation Army*, 2016 WL 4732845, at *4 (D. Ariz. Sept. 12, 2016). He reasoned that the ROE is

jurisdictional—a matter of courts' Article III power to hear cases and controversies—and cannot be forfeited. *Id.* The district judge also dismissed Garcia's ADA claims on the merits. *Id.* at \*5–6.

Garcia appeals, raising two legal questions regarding the application and scope of the ROE. *First*, whether the ROE is jurisdictional, depriving federal courts of subject matter jurisdiction when invoked. And *second*, whether the ROE extends beyond hiring and firing decisions to hostile work environment and retaliation claims. She also challenges the district judge's dismissal of her ADA claims (to which the ROE does not apply). We first address the application of the ROE before turning to the merits of the ADA claim.

## DISCUSSION

**Title VII Claims**

*A. The ROE Applies to the Salvation Army*

The ROE provides that Title VII's protections against discrimination

> shall not apply to an employer with respect to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a). The entity seeking the benefit of the statute bears the burden of proving it is exempt. *EEOC v. Kamehameha Schs./Bishop Estate*, 990 F.2d 458, 460 (9th Cir. 1993).

In applying the ROE, we determine whether an institution's "purpose and character are primarily religious" by weighing "[a]ll significant religious and secular characteristics." *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618 (9th Cir. 1988). It does not suffice that an institution be "merely 'affiliated' with a religious organization." *Id.* at 617. Although we construe the ROE narrowly, often the organization seeking the exemption is "clearly" religious. *Id.* at 618.

This is such a case. *See, e.g.*, Rev. Rul. 59-129, 1959-1 C.B. 58 (noting that the Salvation Army is a "church" under the Internal Revenue Code); *Schleicher v. Salvation Army*, 518 F.3d 472, 478 (7th Cir. 2008) ("The Salvation Army, which has existed in the United States since 1880, is acknowledged to be a completely legitimate church . . . ."); *McClure v. Salvation Army*, 460 F.2d 553, 554 (5th Cir. 1972) ("The Salvation Army is a church . . . ."). The Salvation Army holds regular religious services. It offers social services to customers regardless of their religion "to reach new populations and spread the gospel." Indeed, the Salvation Army's mission statement describes it as

> an evangelical part of the universal Christian church. Its message is based on the Bible. Its ministry is motivated by the love of God. Its mission is to preach the gospel of Jesus Christ

and to meet human needs in His name
without discrimination.**[10]**

The record establishes that, as a church, the Salvation Army
is "clearly" religious. *See Townley*, 859 F.2d at 618 ("[T]he
central function of [the ROE] has been to exempt churches,
synagogues, and the like, and organizations closely affiliated
with those entities."). *Accord Lown v. Salvation Army, Inc.*,
393 F. Supp. 2d 223, 246–54 (S.D.N.Y. 2005) (applying
ROE to the Salvation Army); *Clark v. Salvation Army, LLC*,
2008 WL 11375384, at *1–2 (N.D. Ala. June 16, 2008)
(same).

Garcia argues that the Salvation Army does not qualify
for the ROE because it does not satisfy the fourth factor of a
four-part test discussed in *Spencer v. World Vision, Inc.*, 633
F.3d 723, 724 (9th Cir. 2011) (per curiam), which asks
whether an entity "engage[s] primarily or substantially in the
exchange of goods or services for money beyond nominal
amounts." Garcia contends this factor is not satisfied
because the Salvation Army generates a large-dollar amount
of sales revenue, even though that amount constitutes a small
portion (fifteen percent) of its total income. Moreover, in
2012, 82 cents of every dollar spent by the Salvation Army
went toward its program services. These considerations
aside, the concurring opinions of Judges O'Scannlain and
Kleinfeld, who wrote separately on how to evaluate the
fourth *Spencer* factor, support the Salvation Army's

---

**[10]** The Salvation Army's mission statement is consistent with the
Supreme Court's various articulations of what constitutes a "religion."
*See generally* Note, Ari J. Diaconis, *The Religion of Alcoholics
Anonymous (AA): Applying the Clergy Privilege to Certain AA
Communications*, 99 Cornell L. Rev. 1185, 1213–17 (2014).

entitlement to ROE protection. Under Judge O'Scannlain's approach, the ROE applies if the first three factors identified in the per curiam opinion are satisfied and the organization is a nonprofit. *Spencer*, 633 F.3d at 734 (O'Scannlain, J., concurring). The Salvation Army easily satisfies that test. While Judge Kleinfeld would alternatively ask how the organization charges for its services, he cites the Salvation Army as a group that satisfies this criterion because it "gives its homeless shelter and soup kitchen services away, or charges nominal fees." *Id.* at 747 (Kleinfeld, J., concurring).

### B.  *The ROE Reaches Claims for Retaliation and Hostile Work Environment*

Even assuming the ROE applies to the Salvation Army, Garcia argues that it does not reach her claims for retaliation and hostile work environment. In her view, the ROE applies only to hiring and firing decisions. Although we have not addressed this question, other courts have held that the ROE extends to both retaliation and hostile work environment claims. *See, e.g.*, *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192–94 (4th Cir. 2011); *Saeemodarae v. Mercy Health Servs.*, 456 F. Supp. 2d 1021, 1040–41 (N.D. Iowa 2006); *Lown*, 393 F. Supp. 2d at 254; *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 180 (D.D.C. 2002); *Aguillard v. La. Coll.*, 341 F. Supp. 3d 642, 647–48, 652 (W.D. La. 2018); *Clark*, 2008 WL 11375384, at *1. We agree.

First, the ROE's text reaches beyond hiring and firing. Congress "painted with a broader brush, exempting religious organizations from the *entire subchapter* of Title VII with respect to the *employment* of persons of a particular

religion." *Kennedy*, 657 F.3d at 194 (internal quotation marks omitted) (emphasis added). The "entire subchapter" of Title VII includes protections against retaliation and discriminatory harassment amounting to a hostile work environment.[11] *See* 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a). And "employment" encompasses "the breadth of the relationship between the employer and employee," not just hiring and firing. *Kennedy*, 657 F.3d at 193 (deriving term's definition from settled common-law meaning); *see Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992) (setting out common-law factors for evaluating an employment relationship, including all aspects of employer's control over employee's actions); *cf.* 20 C.F.R. § 404.1007(a) ("In general, you are a common-law employee if the person you work for may tell you what to do and how, when, and where to do it.").

Limiting "employment" to hiring and firing decisions is also inconsistent with the term's use throughout Title VII. For example, Section 2000e-2(a)(1) defines "unlawful

---

[11] Garcia relies on *EEOC v. Pacific Press Publishing Association*, 676 F.2d 1272 (9th Cir. 1982), *abrogated on other grounds as recognized by Am. Friends Serv. Comm. Corp. v. Thornburg*, 951 F.2d 957, 960 (9th Cir. 1991), for the proposition that Congress did not intend the ROE to cover retaliation claims. *Pacific Press*, however, dealt with *sex-based* Title VII claims against a religious publisher. *Id.* at 1274. The plaintiff there claimed that her employer paid her less than her male coworkers and retaliated against her when she filed charges. *Id.* The employer sought to avoid liability on the grounds that the employee's act of filing a lawsuit violated its religious tenets. *See id.* at 1275. There, we held that religious employers facing sex-, race-, and national origin-based claims are not immune from liability for "retaliatory actions against employees who exercise their rights under the statute." *See id.* at 1276. We did not hold that *religion-based* retaliation claims are beyond the reach of the ROE. *Id.*

employment practice" as "to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." There, "'employment' . . . encompasses more than hiring or firing; if the term were so limited, the second clause would be superfluous." *Kennedy*, 657 F.3d at 193. We agree that "'[e]mployment,' as used throughout Title VII, simply covers a much broader understanding than mere hiring and firing." *Id.* Indeed, Garcia conceded at oral argument that a protected organization may lawfully demote an employee based on religious preference. Accepting as much upends her theory that the ROE covers only hiring-and-firing decisions.[12]

In a final effort to avoid the ROE's reach, Garcia maintains that she has not pleaded a cause of action labeled "religious discrimination." Even so, the complaint centers around religious discrimination. Specifically, the first sentence of Count 1 (retaliation) alleges that the Salvation Army subjected Garcia to "discrimination based on religion." The complaint then goes on to specify alleged

---

[12] Garcia also notes that the 2000 edition of the EEOC Compliance Manual suggests that the ROE "only applies to hiring and discharge." U.S. Equal Emp't Opportunity Comm'n, *Compliance Manual* § 2-III(B)(4)(b)(i) (issued May 12, 2000) (hereinafter "EEOC Compliance Manual")). However, the foregoing analysis demonstrates that there is no statutory ambiguity for agency guidance to resolve. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter . . . ."). In any event, "this interpretation, which is viewed under *Skidmore* deference, contains no attendant rationale, lacks the power to persuade, and does not warrant deference." *Kennedy*, 657 F.3d at 194 n.9.

incidents of mistreatment and concludes that they all occurred "after [Garcia] engaged in protected activity by filing an internal grievance from what [she] believe[s] was discrimination based on religion."[13] Count 2 (hostile work environment) simply repleads all the allegations in Count 1.

It is true, as Garcia notes, that Title VII treats workplace discrimination and retaliation claims in separate provisions. *See* 42 U.S.C. §§ 2000e-2(a), 2000e-3(a). Yet both types of claims require a nexus to discrimination. *See id.* Because the ROE permits religious organizations to discriminate based on religion, retaliation claims based on religious discrimination fail against protected organizations because the practice "opposed" is not "unlawful." *See id.* § 2000e-3(a). Likewise, hostile work environment claims must involve status-based harassment, *id.* § 2000e-2(a)(1); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63–64 (1986), and fail against protected organizations where the alleged harassment is based on religion.

## C.  The ROE Bars Garcia's Claims

The Salvation Army failed to raise the ROE as an affirmative defense in its responsive pleading, which would normally result in forfeiture.[14] *See* Fed. R. Civ. P. 12(h)(1)–

---

[13] Indeed, Garcia's internal grievance took issue with her treatment "ever since [she and her husband] left the church." And Garcia's EEOC charge—for which she checked the form's "religious discrimination" and "retaliation" boxes—states, "Ever[] since I left the Church my immediate supervisor . . . has been subjecting me to disparate treatment."

[14] "[F]orfeiture is the failure to make the timely assertion of a right[;] waiver is the intentional relinquishment or abandonment of a known

(2). The district judge, however, held that the ROE is jurisdictional, and as such, the defense cannot be relinquished. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines *at any time* that it lacks subject-matter jurisdiction, the court must dismiss the action." (emphasis added)).

1. *The ROE is Nonjurisdictional and Subject to Forfeiture*

In *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006), the Supreme Court established the "bright line" rule that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." Three factors guide our analysis. *See Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 976–77 (9th Cir. 2012). First is whether the provision is "clearly labeled jurisdictional." *Id.* at 976 (quotation marks omitted). Second is whether the provision is "located in a jurisdiction-granting provision." *Id.* at 976–77. Third is whether some "other reasons necessitate[] that the provision be construed as jurisdictional." *Id.* at 977.

The ROE is not labeled jurisdictional. *See* 42 U.S.C. § 2000e-1(a). It does not use the term "jurisdiction" nor speak in jurisdictional terms about the power of United States courts to hear cases under Title VII. *Compare id. with* 28 U.S.C. §§ 1345, 1348, 1350. Rather, it appears in a separate provision from that establishing federal courts' jurisdiction over Title VII claims, which militates against

---

right." *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17 n.1 (2017) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). Thus, the case before us concerns a procedural forfeiture.

classifying it as jurisdictional. *See* 42 U.S.C. § 2000e-5(f)(3) (conferring jurisdiction over Title VII claims to federal district courts). Put otherwise, the ROE limits entitlement to relief in a narrow class of cases, not "the authority of federal courts to adjudicate claims under [Title VII]." *Leeson*, 671 F.3d at 978. The district judge erred by ranking the ROE jurisdictional where Congress did not. *See Arbaugh*, 546 U.S. at 516.

The Salvation Army maintains that a claim cannot possibly arise under Title VII where Congress has mandated Title VII "shall not apply." But that is precisely the consequence of *Arbaugh*. Title VII imposes no liability on employers with fewer than 15 employees. *See* 42 U.S.C. § 2000e(b). Yet the defendant in *Arbaugh*—an employer with fewer than 15 employees—forfeited this argument by failing to raise it until after trial. *Arbaugh*, 546 U.S. at 503–04, 510, 516. The employer was held liable, even though Congress did not intend Title VII to reach it. *Id.* at 516. Such is the consequence of failing to raise a nonjurisdictional defense. *See id.* at 510–11.

Our decision in *United States v. Hui Hsiung*, 778 F.3d 738 (9th Cir. 2015), provides a useful analog. There, we held that the Foreign Trade Antitrust Improvements Act (FTAIA), 15 U.S.C. § 6a, which limits conduct covered by the Sherman Act, is nonjurisdictional. *Hui Hsiung*, 778 F.3d at 752–53. Section 4 of the Sherman Act confers upon federal district courts jurisdiction "to prevent and restrain violations of sections 1 to 7 of this title." 15 U.S.C. § 4. The FTAIA, like the ROE, provides that "[s]ections 1 to 7 of this title *shall not apply*," unless certain conditions are satisfied. *Id.* § 6a (emphasis added). Nevertheless, we held that the

impact of the FTAIA on Sherman Act claims "is a merits question, not a jurisdictional one." *Hui Hsiung*, 778 F.3d at 752. As the Supreme Court has explained, "to ask what conduct [a statute] reaches is to ask what conduct [the statute] prohibits, which is a merits question." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010). The ROE, like the FTAIA, "removes conduct from [Title VII's] reach," bearing on the question of "what conduct [Title VII] prohibits," not the power of courts to hear a case. *Hui Hsiung*, 778 F.3d at 752 (internal quotation marks and alterations omitted).

Indeed, the Seventh Circuit has held that Title VII's domestic-work requirement, embodied in Section 2000e-1(a) alongside the ROE, is nonjurisdictional, as it "appears outside of the statute's jurisdictional provision" and "[t]here is no other reason to believe that Congress intended to 'rank' the restrictions as jurisdictional." *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 869 (7th Cir. 2011); *see also Maguire v. Marquette Univ.*, 814 F.2d 1213, 1216 (7th Cir. 1987) (application of 42 U.S.C. § 2000e-2(e)(1), permitting educational institutions "to hire and employ employees of a particular religion" under certain circumstances, is not a question of subject matter jurisdiction). And the only court to expressly address whether the ROE itself is jurisdictional found that it is not. *See Smith v. Angel Food Ministries, Inc.*, 2008 WL 5115037, at *4 (M.D. Ga. Dec. 4, 2008), *on reconsideration* 611 F. Supp. 2d 1346 (M.D. Ga. 2009).

We recognize that a number of courts have suggested that the ROE can *never* be waived or forfeited. *See, e.g.*, *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 625 (6th Cir. 2000); *Ark Encounter, LLC v. Parkinson*, 152 F. Supp.

3d 880, 915 n.25 (E.D. Ky. 2016); *Saeemodarae*, 456 F. Supp. 2d at 1038–39; *Siegel v. Truett-McConnell Coll., Inc.*, 13 F. Supp. 2d 1335, 1345 (N.D. Ga. 1994). These cases, like the district court's opinion below, can be traced to the Third Circuit's decision in *Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991), where a Catholic school invoked the ROE after declining to rehire a Protestant teacher. The teacher argued that the school "waived" the ROE, because it knew she was Protestant when it hired her. *Id.* at 951. *Little* held that the ROE was not "a privilege or interest" that could be waived but rather "a decision by Congress that the government interest in eliminating religious discrimination by religious organizations is outweighed by the rights of those organizations to be free from government intervention," meaning that "no act by Little or the Parish could expand the statute's scope." *Id.* Other courts subsequently concluded that the ROE "cannot be waived by either party." *E.g.*, *Hall*, 215 F.3d at 625.

*Little* is inapposite because it concerned the validity of an implied waiver defense based on an organization's pre-suit conduct—not a procedural forfeiture. *See Little*, 929 F.2d at 951. A statutory defense is not unrelinquishable per se simply because it embodies Congress's intent to limit a class of claims. To the contrary, even where Congress has mandated that a statute "shall not apply" under certain circumstances, we have routinely applied forfeiture principles. *See, e.g.*, *Magana v. Commonwealth of the Northern Mariana Islands*, 107 F.3d 1436, 1445 (9th Cir. 1997) (failure to plead FLSA exemption can result in forfeiture); *Brennan v. Valley Towing Co., Inc.*, 515 F.2d 100, 104 (9th Cir. 1975) (same). *See generally* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and*

*Procedure* § 1271 (3d ed. 2004) (collecting cases). We see no reason to treat the ROE differently.

### 2. *Absent Prejudice, the ROE May Be First Raised at Summary Judgment*

Although statutory exemptions are not among the affirmative defenses enumerated in Rule 8(c), *see* Fed. R. Civ. P. 8(c), we have explained that they must be raised in a party's "initial responsive pleading." *See Magana*, 107 F.3d at 1445. Accordingly, the Salvation Army was required to plead the ROE as an affirmative defense. *Cf. Oden v. Oktibbeha County*, 246 F.3d 458, 466–67 (5th Cir. 2001) (holding that Title VII's personal-staff exception must be pleaded as an affirmative defense). This makes sense given that the defendant "bear[s] the burden of proving [it is exempt]," *Kamehameha*, 990 F.2d at 460, and the facts necessary to invoke the exemption are "outside of the plaintiff's prima facie case," Wright & Miller, *supra*, § 1271.

The Salvation Army did not raise the ROE in its answer but insists that it pleaded enough to put Garcia on notice. First, it pleaded that Garcia failed to state a claim upon which relief can be granted, a defense which may be raised up and until the close of trial. Fed. R. Civ. P. 12(h)(2). But simply stating that the plaintiff failed to state a claim is insufficient to provide notice of a specific affirmative defense. *See Simmons v. Navajo County*, 609 F.3d 1011, 1023 (9th Cir. 2010) ("The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense." (quoting *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979))), *abrogated in part by Castro*

*v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc). And independent of Rule 12(b)(6), Rule 8(c) requires that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(c).

The Salvation Army also pleaded "that any adverse employment actions taken against plaintiff were taken for lawful, legitimate, non-retaliatory, and non-discriminatory reasons." On its face, this defense does not refer to the ROE but rather the standard for rebutting a prima facie claim of discrimination on the merits. *See Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1094 (9th Cir. 2005). Thus, the Salvation Army failed to timely raise the ROE.

Even so, "[i]n the absence of a showing of prejudice . . . an affirmative defense may be raised for the first time at summary judgment." *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993). There is no prejudice to a plaintiff where an "affirmative defense would have been dispositive" if asserted "when the action was filed." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001). Rather, a party must point to a "tangible way in which it was prejudiced by the delay." *See Ledo Fin. Corp. v. Summers*, 122 F.3d 825, 827 (9th Cir. 1997).

The only prejudice Garcia asserts is that she was denied discovery to test the Salvation Army's defense. But as a former member of the Salvation Army's congregation, Garcia was intimately familiar with its religious focus and mission. *See, e.g.*, ER 133–34 (deposition excerpts describing Garcia's participation in religious services); ER 633 (Garcia's opposition to motion for summary judgment

indicating "[s]he believed she would be working in an environment that was respectful, [c]haritable and encouraging and above all Christ[-]like"). And the Salvation Army's status as a nonprofit corporation is public, along with its yearly financial reports. Absent prejudice, the Salvation Army permissibly invoked the ROE at summary judgment, and it applies to foreclose Garcia's Title VII claims.

## ADA Claim

The district court properly granted the Salvation Army summary judgment on Garcia's ADA claim. We begin by briefly recounting the underlying circumstances. Following a period of leave under the Family and Medical Leave Act of 1993 ("FMLA") from October to December 2013, Garcia sought additional personal leave, explaining that she "ha[d] been advised not to return to a stressful working environment for health reasons." The Salvation Army responded by asking her to provide medical documentation "outlining working restrictions and estimated date of return to full duty." Garcia complied, and her request was granted. The Salvation Army repeatedly extended Garcia's leave through May 5, 2014.

On May 5, 2014, Garcia informed the Salvation Army that her doctor had cleared her to return to work on May 26, "without restrictions." But Garcia said she would not return to work because she was "not ready to go back into the exact same working environment which [her] doctors ha[d] advised against" and "[t]here seem[ed] to be a mental block/barrier" regarding the customer complaint filed against her in July 2013. She therefore requested the

"accommodation" that "a copy or summary of [the client] complaint . . . be made available to [her] before [she] return[ed] to work." The Salvation Army declined and demanded medical evidence supporting her disability and proposed accommodation.

This time, Garcia did not submit the requested medical information. As a result, the Salvation Army made clear that Garcia's continued absence was not excused, "jeopardizing [her] continued employment." Even so, on June 17, 2014, the Salvation Army provided a summary of the client complaint but explained that Garcia would "need a doctor's note to allow us to assess your accommodation request and your continued absence." Garcia disputed the summary of the complaint and reiterated her request for a copy. She did not report to work. On July 10, 2014, the Salvation Army terminated Garcia's employment due to unexcused absence.

"The ADA prohibits discrimination 'against a qualified individual on the basis of disability in regard to . . . job training[] and other terms, conditions, and privileges of employment.'" *EEOC v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1110 (9th Cir. 2010) (quoting 42 U.S.C. § 12112(a)). "[D]iscrimination includes an employer's not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002) (emphasis and quotation marks omitted). An "interactive process" is required upon a request for an accommodation. *UPS Supply Chain*, 620 F.3d at 1110

(quoting *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002)).

"To be entitled to the interactive process that leads to a reasonable accommodation, an employee must have a 'disability' within the meaning of the ADA." *Becerril v. Pima Cty. Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009) (per curiam). A doctor's release to work without restrictions supports a finding that a person no longer suffers from a "disability." *See, e.g.*, *Rivera v. FedEx Corp.*, 2013 WL 6672401, at \*4 (N.D. Cal. Dec. 18, 2013) (plaintiff failed to demonstrate disability where cleared by doctor without restrictions); *cf. Stevenson v. Abbott Labs.*, 639 F. App'x 473, 474 (9th Cir. 2016) ("[A]fter Plaintiff was released to work, she was not disabled."). Moreover, an employer "do[es] not have a duty under the ADA . . . to engage in further interactive processes . . . in the absence of" requested medical evidence. *See Allen v. Pac. Bell*, 348 F.3d 1113, 1115 (9th Cir. 2003) (per curiam).

First, Garcia claims that the Salvation Army failed to interact with her in good faith to arrive at a reasonable accommodation in the months leading up to May 26, 2014, the day Garcia was slated to return to work. The record does not support this assertion. To the contrary, each step of the way, the Salvation Army extended Garcia's leave. This was the only accommodation requested by Garcia and documented by her physician. At no time before her doctor's unconditional release did Garcia indicate that she desired to return to work on a modified basis. Accordingly, no reasonable jury could find that the Salvation Army failed to engage in an interactive process with Garcia from the time of her leave up and until the time she was cleared for work.

Garcia next alleges that the Salvation Army refused to negotiate in good faith after Garcia insisted on receiving a copy of the secret customer complaint rather than a summary. This request, however, only came after Garcia was cleared for work "without restrictions." Garcia cannot show that she suffered from a disability at that time, and she failed to provide supporting medical documentation despite multiple requests. The Salvation Army was not required to continue an interactive process in the absence of medical evidence. *See Allen*, 348 F.3d at 1115.

Moreover, even after the Salvation Army provided a summary of the client complaint as requested, Garcia protested and demanded to see the original complaint. This only underscores that Garcia's requested "accommodation" is not cognizable under the ADA. A "reasonable accommodation" includes "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). Obtaining a copy of a year-old client complaint is unrelated to the "essential functions" of Garcia's former position. *See Gonzagowski v. Widnall*, 115 F.3d 744, 747–48 (10th Cir. 1997) ("While specific stressors in a work environment may in some cases be legitimate targets of accommodation, it is unreasonable to require an employer to create a work environment free of stress and criticism.").

Finally, Garcia argues that the Salvation Army failed to interact in good faith because it had decided to eliminate her position rather than negotiate with her. This allegation,

however, is derived from a draft letter to Garcia dated May 27, 2014, which was never used or sent. To the contrary, the Salvation Army continued Garcia's leave until July 10, 2014, when she was finally terminated. Regardless, as discussed, the Salvation Army was under no obligation to engage in an interactive process in the absence of a disability. For these reasons, Garcia fails to make out a claim under the ADA.

## CONCLUSION

We hold that the ROE is nonjurisdictional and subject to procedural forfeiture. Absent prejudice resulting from the Salvation Army's failure to timely raise the defense, however, the ROE forecloses Garcia's Title VII claims for retaliation and hostile work environment. Garcia's ADA claim fails on the merits. The judgment of the district court is therefore **AFFIRMED**.